150 F.2d 964 (1945)
CALIFORNIA LIMA BEAN GROWERS ASS'N
v.
BOWLES, Price Administrator.
No. 205.
United States Emergency Court of Appeals.
Heard June 25, 1945.
Decided August 14, 1945.
*965 *966 Karl D. Loos, of Washington, D. C., for complainant.
John O. Honnold, Jr., Sp. Asst. to Associate Gen. Counsel, O. P. A., of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and James A. Durham and Wm. W. Stafford, Attys., all of O. P. A., all of Washington, D. C., on the brief), for respondent.
Donald J. Sherbondy, Assoc. Sol., Department of Agriculture, of Washington, D. C. (Robert H. Shields, Sol., and W. Carroll Hunter, Associate Sol., both of Washington, D. C., Justin H. Folkerth, of Columbus, Ohio, and Frank F. Vesper, Attys., of Mansfield, Ohio, all of Department of Agriculture, on the brief), for War Food Administrator, amicus curiae.
Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
Heard at Washington June 25, 1945.
MARIS, Chief Judge.
Maximum prices for dry standard lima beans are established by Second Revised Maximum Price Regulation No. 270  Dry Edible Beans and Certain Dry Food Commodities.[1] This regulation, as amended,[2] is here under attack. Before dealing with the principal question which the case presents it is appropriate to pass upon the complainant's contention that the regulation is invalid because it was not approved by the Secretary of Agriculture as required by Section 3(e) of the Emergency Price Control Act.[3]
It is conceded that the Secretary of Agriculture did not approve the regulation or its amendment. The regulation and amendment were, however, approved by the War Food Administrator acting pursuant to executive order which purported to transfer to him the functions of the Secretary of Agriculture under the Emergency Price Control Act. The complainant's contention is that the executive order in question was not authorized by law and was, therefore, ineffectual to transfer the powers and duties of the Secretary of Agriculture in this connection to the War Food Administrator.
The authority of the Secretary of Agriculture to approve maximum price regulations under Section 3(e) of the Emergency Price Control Act was transferred by the President to the War Food Administrator by Executive Order 9334, 50 U.S.C.A.Appendix § 601 note, 8 F.R. 5423. This action by the President was taken pursuant to power conferred upon him by Section 1 of the First War Powers Act.[4] The complainant urges that this Act, when properly construed, does not confer upon the President power to make such a transfer. It points to the fact that the First War Powers Act was enacted December 18, 1941, whereas the power to approve price regulations was conferred upon the Secretary of Agriculture by the Emergency Price Control Act of 1942 which was not enacted until January 30, 1942. It asserts that the only functions which under the First War Powers Act could be transferred by the President were those which were in existence prior to the enactment of the act.
The pertinent language of the First War Powers Act is:
"Section 1. That for the national security and defense, for the successful prosecution of the war, for the support and maintenance of the Army and Navy, for the better utilization of resources and industries, and for the more effective exercise and more efficient administration by the President of his powers as Commander in Chief of the Army and Navy, the President is hereby authorized to make such redistribution of functions among executive agencies as he may deem necessary, including any functions, duties, and powers hitherto by law conferred upon any executive department, commission, bureau, agency, governmental corporation, office, or officer, in such manner as in his judgment shall seem best fitted to carry out the purposes of this title. * * *
"Section 5. * * * Upon the termination of this title all executive or administrative agencies, governmental corporations, departments, commissions, bureaus, offices, or officers shall exercise the same functions, duties, and powers as heretofore or as hereafter by law may be provided, any authorization of the President under this title to the contrary notwithstanding."
We think that a natural and unstrained reading of the language just quoted *967 requires the conclusion that the power conferred upon the President to transfer functions from one to another executive agency was intended to extend to any and all functions whether existing before or after the passage of the First War Powers Act. The use in Section 1 of the clause "including any functions, duties, and powers hitherto by law conferred upon any executive department, commission, bureau, agency, governmental corporation, office, or officer" indicates that the general language of the section was intended to grant power to redistribute functions conferred after as well as before the passage of the act. This is also borne out by the provision of Section 5 that upon the termination of the act all executive and administrative agencies "shall exercise the same functions, duties, and powers as heretofore or as hereafter by law may be provided" regardless of any redistribution thereof made by the President under the act. Unless Section 1 authorizes the President to redistribute functions provided for by legislation enacted after the passage of the act, the reference to "the same functions * * * as hereafter by law may be provided" is wholly meaningless.
Additional support for the position that the President's executive order transferring the functions of the Secretary of Agriculture to the War Food Administrator was in harmony with the Congressional intent is found in subsequent Congressional action. Thus Congress, fully aware of the fact that the functions of the Secretary of Agriculture under the Emergency Price Control Act and the Stabilization Act had been transferred to the War Food Administrator, passed the Stabilization Extension Act of 1944 without making any change in Section 3 of either act. We note also that in the Department of Agriculture Appropriation Acts of 1944 and 1945 provision was made for "expenses necessary to enable the War Food Administration to perform its functions, including those prescribed by Executive Orders * * * 9334 * * *."[5] Since Executive Order 9334 is the one whereby the President transferred the functions in question of the Secretary of Agriculture to the War Food Administrator it would appear that Congress knew of and did not disapprove their transfer.
We conclude that the First War Powers Act did confer upon the President power to transfer subsequently created functions of the Secretary of Agriculture to the War Food Administrator.
The complainant makes the independent point that even assuming that the First War Powers Act did give the President power to make the transfer the right to do so was denied by the Emergency Price Control Act itself. The complainant stresses that Section 3(e) of the Emergency Price Control Act requires that the Price Administrator obtain the approval of the Secretary of Agriculture "Notwithstanding any other provision of this or any other law". However Section 201(b) of the Act[6] which deals directly with the subject of the transfer of functions, provides as follows: "* * * notwithstanding any provision of this or any other law, no powers or functions conferred by law upon the Secretary of Agriculture shall be transferred to the Office of Price Administration or to the Administrator, and no powers or functions conferred by law upon any other department or agency of the Government with respect to any agricultural commodity, except powers and functions relating to priorities or rationing, shall be so transferred." It is apparent that the Congressional purpose was merely to prohibit the transfer of the functions of the Secretary of Agriculture under the Emergency Price Control Act to either the Office of Price Administration or the Price Administrator. So long as the action of the Price Administrator with regard to agricultural commodities was subject to the control of the Secretary of Agriculture or of some other officer not connected with the Office of Price Administration to whom the Secretary's functions had been transferred the object which Congress had in mind was served.
We conclude that the regulation and amendment were not invalid because approved by the War Food Administrator rather than by the Secretary of Agriculture.
We turn then to the principal question which this case presents. That question is whether the maximum prices established for dry standard lima beans by the regulation and amendment thereto here under attack meet the requirements of Section 3 of the Stabilization Act of 1942 that they shall not be less than the parity price for the agricultural commodity to which they relate,[7] as *968 determined and published by the Secretary of Agriculture, now the War Food Administrator.
It is not disputed that the War Food Administrator has determined and published a parity price for dry edible beans encompassing dry standard lima beans and that the maximum prices fixed by the regulation in question are higher than the parity price thus determined. The complainant's contention is that the act contemplates the determination of a parity price for each separate agricultural commodity and that the parity price which the War Food Administrator has determined for dry edible beans is not such a parity price because it is a composite price for two or more agricultural commodities.
The contention is based upon the proposition, which the complainant vigorously asserts, that dry standard lima beans constitute an agricultural commodity wholly separate and distinct from all other varieties of dry edible beans. In support of this proposition the complainant points to the biological differences between lima beans and other species of beans and to the differentials between the prices customarily received for dry standard lima beans and for other dry edible beans. On the other hand the Price Administrator and the War Food Administrator, who was heard as amicus curiae, stressed the features of distribution and use which link dry standard lima beans to other varieties of dry edible beans and argue therefrom that the action of the War Food Administrator in treating all dry edible beans as a single agricultural commodity was justified.
We need not enter this interesting controversy, however, since we are of opinion that the action of the War Food Administrator in determining and publishing parity prices for agricultural commodities is not open to question either by the Price Administrator in establishing maximum prices or by a complainant who seeks to attack such prices in this court. Indeed the complainant does not dispute the proposition that the War Food Administrator's determination of the parity prices contemplated by the statute is not subject to review. It merely contends that it is open to this court to decide whether a purported parity price determined and published by the War Food Administrator is such a parity price as is contemplated by the statute. It asserts that the statutory requirement is not met by the determination and publication of a single parity price for a group of agricultural commodities and that this court should therefore hold that the parity price for dry edible beans determined and published by the War Food Administrator was not a parity price in the sense meant by Section 3 of the Stabilization Act.
We cannot agree with the complainant that this court has power to review the determination of the War Food Administrator as to what constitutes an agricultural commodity with respect to which parity prices are to be determined and published by him. On the contrary, we think that this determination is one which has been confided to the technically informed judgment of the War Food Administrator and that at least insofar as price control is concerned his determination of it is final and conclusive. Compare United States v. Wrightwood Dairy Co., 7 Cir., 1942, 127 F. 2d 907, 912. Moreover we do not think that the maximum prices in question would be invalid even if it were to be held that no valid parity price for dry standard lima beans had been determined and published within the meaning of Section 3 of the Stabilization Act.
The complainant contends that under the Emergency Price Control Act and Section 3 of the Stabilization Act the Price *969 Administrator has no power to promulgate maximum prices for a given agricultural commodity unless and until the War Food Administrator has determined and published a parity price for that commodity. We do not so read the acts. On the contrary we think that the provisions of Section 3 of the Stabilization Act are merely intended to put a floor under the maximum prices which the Price Administrator may establish for those agricultural commodities with respect to which the War Food Administrator determines and publishes parity prices.
In the Emergency Price Control Act and the Stabilization Act Congress was immediately concerned with the problem of the control of a wartime threatened inflation and entrusted to the Price Administrator the task of meeting that threat. The establishment of maximum prices for commodities was the principal means made available to the Price Administrator with which to accomplish his task. However, for many years prior to the war Congress had been struggling with another problem, that of securing to the farmers of the nation a return for their agricultural commodities sufficient to enable them to maintain a normal purchasing power. The effort, first made in the Agricultural Adjustment Act of 1933[8] and later continued in the Agricultural Marketing Agreement Act of 1937[9] and the Agricultural Adjustment Act of 1938,[10] was to re-establish prices to farmers at a level designed to give agricultural commodities a purchasing power with respect to articles that farmers buy equivalent to the purchasing power of agricultural commodities in an earlier base period. This was designated as "parity."[11]
Congressional concern for the maintenance of agricultural prices was carried over into the price control legislation. As we have seen, it is there provided that, in addition to the standards to which the Price Administrator must conform in establishing maximum prices for other commodities, in the case of an agricultural commodity he must establish the maximum price at a level not less than the parity price as determined and published by the Secretary of Agriculture, now the War Food Administrator. But the statutory directive to the Price Administrator is not that he shall use the parity price as a necessary element in computing his maximum price for the agricultural commodity in question but merely that his maximum price shall reflect to producers of the commodity such parity price as shall have been determined and published under the existing agricultural legislation to which we have referred by the officer to whom that task is entrusted, now the War Food Administrator. In the absence of such a determination there is no parity price to which the Price Administrator must conform in establishing his maximum prices.
Under Section 3(e) of the Emergency Price Control Act regulations and orders which impose maximum prices upon agricultural commodities are required to have the prior approval of the Secretary of Agriculture, now the War Food Administrator, as we have seen. We cannot think that Congress intended that the prices of an agricultural commodity which the Price Administrator finds have risen or threatened to rise to an unwarranted and abnormal extent and which he has undertaken to control by a price regulation to which the War Food Administrator has expressly given his approval should nonetheless be wholly exempt from price control and thus left open to inflationary increases merely because the latter officer had not also determined and published a parity price for the commodity.
The complainant makes the alternative contention that if the parity price for dry edible beans is to be accepted as a lawful parity price within the contemplation of *970 Section 3 of the Stabilization Act it should nevertheless be adjusted by the War Food Administrator so far as dry standard lima beans are concerned by adding a percentage differential representing the historical difference in price between dry standard lima beans and the other common varieties of dry edible beans. This contention is likewise without merit for the reasons already stated.
The War Food Administrator having determined and published a parity price for dry edible beans, a commodity which includes dry standard lima beans, that parity price is binding upon both the Price Administrator and the complainant and is not subject to adjustment so far as its application to price control under Section 3 of the Stabilization Act is concerned. This does not mean that the Price Administrator need not take account of historical price differentials in fixing the maximum prices for the different varieties of dry edible beans. Other provisions of the Emergency Price Control Act may well require such action on his part. It does mean, however, as has been suggested, that under Section 3 of the Stabilization Act the parity price is merely the floor below which the maximum price may not be fixed and that if the maximum price for any variety of dry edible beans is fixed above that floor it satisfies the provisions of Section 3 of the Stabilization Act with respect to parity prices.
As an additional ground of invalidity the complainant objects to the regulation in question because, as it asserts, the Administrator has failed therein to maintain the normal price differentials between dry standard limas and the white and colored varieties of dry common beans since the time that the latter were given higher maximum prices on sales to the Government and other designated purchasers under the support price program adopted by the Commodity Credit Corporation. The complainant's contention is that this disruption of differentials has compelled a radical change in long continued and well established trade practices in violation of Section 2(h) of the Emergency Price Control Act.[12] The record shows that the support price program for dry edible beans was established by the Commodity Credit Corporation in order to stimulate production of those varieties of beans of which greater supplies were needed for military procurement, lend-lease and civilian consumption.
It is clear that the narrowing of the differentials between the maximum prices for dry standard limas and other varieties of dry edible beans which thus resulted is not a violation of Section 2(h). In the first place it may well be questioned whether the maintenance of a price differential can ever be anything more than a mere pricing practice and as such not within the purview of Section 2(h). Compare Philadelphia Coke Co. v. Bowles, Em.App., 1943, 139 F.2d 349. But aside from this the record shows that there has been no constant relationship between the prices of dry standard limas and other varieties of dry edible beans. Accordingly the complainant has failed to show an established practice within the protection of Section 2(h). Compare Wells Lamont Corporation v. Bowles, Em. App., 1945, 149 F.2d 364.
Moreover the act, considered as a whole, does not require the Administrator to maintain an historic price differential in such a situation as is here disclosed. One of the purposes of the act is "to assist in securing adequate production of commodities". As we pointed out in Seaboard Oil Co. of Delaware v. Bowles, Em.App.1945, 149 F.2d 661, 664, "In order to effectuate this purpose it is necessary for the Administrator from time to time to authorize for particular sellers or groups of sellers increases in the maximum prices of commodities subject to shortage. It would, however, defeat the major purpose of the Act to stabilize prices if such a necessary individual price increase could be made the basis for an industry wide price increase in an industry in which the existing prices were generally fair and equitable."
We think that this reasoning is applicable to the present case. In order to secure necessary production of certain varieties of beans a support program which involved a price increase for those varieties was determined to be necessary. To extend a comparable price increase to all other varieties of beans would obviously be inflationary. It would, therefore, be unwarranted in the absence of a showing that the existing maximum prices for such other varieties of beans were themselves no longer generally fair and equitable in that they operated to prevent the industry generally from securing its normal prewar return. No such showing has been attempted in this case.
Another ground of invalidity asserted *971 by the complainant is that the maximum prices in question fail to reflect increased labor costs incurred since January 1, 1941 and that in the determination of the maximum prices adequate weighting was not given to farm labor, all as required by Section 3 of the Stabilization Act.[13] The record in this case supports the Price Administrator's conclusion that the maximum prices here in question more than reflect the actual increases since January 1, 1941 in the labor and other costs incurred by producers of dry edible beans. The complainant urges, however, that the January, 1941 parity price for dry standard lima beans should be used as the starting point for one of the statutory tests imposed by Section 3 instead of the parity price for dry edible beans as a group and that in applying the statutory tests the farmer's own labor and that of his family should be included. The first of these contentions has already been disposed of, since, as we have seen, the parity price fixed for all dry edible beans must be taken to be the parity price for dry standard lima beans as well. The distinction between parity prices which the complainant here seeks to raise has, therefore, no support in the record.
The second contention is equally without merit. The "increased labor * * * costs" to which Section 3 refers are out-of-pocket costs of hired labor. The value of the labor of the farmer and the members of his family cannot be "costs" to the farmer. The Price Administrator takes the position that the requirement of Section 3 of the Stabilization Act that "in fixing price maximums for agricultural commodities * * * adequate weighting shall be given to farm labor" has been satisfied if the maximum prices in question fairly and adequately reflect increases in "labor or other costs * * * incurred since January 1, 1941," as required by the preceding proviso of Section 3. We think that the legislative history of the act supports this construction.[14] Moreover, as the Price Administrator pointed out in argument, *972 the complainant has offered no evidence that the maximum prices for dry edible beans do not give adequate weighting to farm labor or that they fail to reflect any actual increases in this or any other costs of production. On the contrary the record supports the conclusion that the maximum prices in question are more than sufficient to cover all increases in production costs incurred since January 1, 1941, including a factor for the theoretical cost of family labor.
We conclude that the regulation, as amended, is valid.
A judgment will be entered dismissing the complaint.
NOTES
[1] 8 F.R. 16166, issued November 27, 1943.
[2] Amendment No. 3, issued July 29, 1944, 9 F.R. 9260.
[3] 50 U.S.C.A.Appendix, § 903(e).
[4] 50 U.S.C.A.Appendix, § 601 et seq.
[5] 57 Stat. 415; 58 Stat. 447.
[6] 50 U.S.C.A.Appendix, § 921(b).
[7] The pertinent provisions of Section 3 of the Stabilization Act of 1942, 50 U.S.C.A.Appendix, § 963, are as follows:

"Section 3. No maximum price shall be established or maintained for any agricultural commodity under authority of this Act or otherwise below a price which will reflect to producers of agricultural commodities the higher of the following prices, as determined and published by the Secretary of Agriculture 
"(1) The parity price for such commodity (adjusted by the Secretary of Agriculture for grade, location, and seasonal differentials) * * *, or
"(2) The highest price received by such producers for such commodity between January 1, 1942, and September 15, 1942 (adjusted by the Secretary of Agriculture for grade, location, and seasonal differentials) * * *."
Section 3 of the Stabilization Act superseded paragraphs (a) and (c) of Section 3 of the Emergency Price Control Act upon the suspension of the latter by the President on October 3, 1942, by Executive Order 9250, 50 U.S.C.A. Appendix, § 901 note, 7 F.R. 7871, pursuant to authority conferred upon him by Section 2 of the Stabilization Act.
[8] 48 Stat. 31, 7 U.S.C.A. § 601 et seq.
[9] 50 Stat. 246, 7 U.S.C.A. § 601 et seq.
[10] 52 Stat. 38, 7 U.S.C.A. § 1301 et seq.
[11] "`Parity,' as applied to prices for any agricultural commodity, shall be that price for the commodity which will give to the commodity a purchasing power with respect to articles that farmers buy equivalent to the purchasing power of such commodity in the base period; and, in the case of all commodities for which the base period is the period August 1909 to July 1914, which will also reflect current interest payments per acre on farm indebtedness secured by real estate, tax payments per acre on farm real estate, and freight rates, as contrasted with such interest payments, tax payments, and freight rates during the base period. The base period in the case of all agricultural commodities except tobacco shall be the period August 1909 to July 1914, and, in the case of tobacco, shall be the period August 1919 to July 1929." Agricultural Adjustment Act of 1938, § 301(a) (1), 7 U.S.C.A. § 1301 (a) (1).
[12] 50 U.S.C.A.Appendix, § 902(h).
[13] The relevant provisions of Section 3 are as follows:

"Provided further, That modifications shall be made in maximum prices established for any agricultural commodity * * * where by reason of increased labor or other costs to the producers of such agricultural commodity incurred since January 1, 1941, the maximum prices so established will not reflect such increased costs: * * * Provided further, That in fixing price maximums for agricultural commodities * * * adequate weighting shall be given to farm labor."
[14] The stabilization bill as passed by the House of Representatives (H.R. 7565, 77th Cong., 2nd Sess.) provided that "parity prices * * * shall be determined as authorized by existing law but shall also include all farm labor." The same provision was contained in the original Thomas-Hatch amendment proposed to the Senate stabilization bill. (88 Cong.Rec. 7244). Senator Thomas explained that the amendment required the inclusion in the parity price calculations not only of the hired labor but also that of the farmer and his family used on the farm in producing agricultural products (88 Cong.Rec. 7245). The proposal to revise the parity formula was later abandoned and a new amendment proposed by Senators Thomas, George, Hatch and Aiken which provided that "all productive costs of such agricultural commodity, including labor, shall be reflected in any such maximum prices so established." Senator Thomas explained that this amendment "* * * in place of directing the administrator of the act to consider all labor costs, which would include * * * the labor to be hired, the labor of the farmer himself, and the labor of his wife and children, we simply say, `including farm labor', and leave it to the administrator to determine whether or not all labor shall be considered, or whether hired labor and the farmer's labor shall be considered. It leaves it flexible." (88 Cong.Rec. 7524.) This amendment was subsequently withdrawn and a compromise amendment which was proposed by Senators Tydings, Reed, O'Mahoney and Barkley and modified by Senator Barkley was adopted by the Senate and agreed to in substance by the House of Representatives after conference. This amendment contained the substance of the provisos now appearing in Section 3. It did not contain any provision that "all farm labor" be considered, however. It was stated by Senator Thomas that "the amendment as modified is not all that the Senate Agricultural Committee and the leaders of the farm organizations desire." (88 Cong.Rec. 7618.) In a summary of the conference report on the bill offered by Senator Brown, one of the conferees, it was stated: "Whenever price increases on any farm commodity since January 1, 1941, are more than offset by general increases in the costs of producing farm commodities, the bill therefore requires that the return to the grower shall be adjusted. Increased labor costs as reflected in rising wage rates for hired farm labor must be included in determining the extent of increased costs to growers." (Emphasis supplied) (88 Cong.Rec. 7722.)