## SUWANNEE FRUIT & STEAMSHIP CO. v. FLEMING, Temporary Controls Administrator.

### Nos. 116 and 317.

United States Emergency Court of Appeals.

Heard at Jacksonville Nov. 12, 1946.
Decided April 9, 1947.

Rehearing Denied May 8, 1947.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

Thomas B. Adams, Louis Kurz, and Charles H. Murchison, all of Jacksonville, Fla. (John A. Selby, of Washington, D. C., on the brief), for complainant.

James A. Durham, Atty., O.P.A., of Washington, D. C. (Richard H. Field, Gen. Counsel, Carl A. Auerbach, Associate Gen. Counsel, William R. Ming, Jr., Chief, Court Review Price Branch, and Benjamin Freidson, Atty., all of O.P.A., all of Washington, D. C., on the brief), for respondent.

MARIS, Chief Judge.

Maximum Price Regulation No. 285, imported Fresh Bananas, Sales Except at Retail,[1] established maximum prices of $4.50 per cwt. for bananas from Costa Rica, Panama, Guatemala, Honduras and from the southern Mexican states of Chiapas and Tabasco; $3.25 per cwt. for bananas from other parts of Mexico; and $4.00 per cwt. for bananas from all other countries, which included those from the Dominican Republic. The maximum prices for bananas from the four Central American countries and from Chiapas and Tabasco was increased to $5.50 per cwt. by Amendment No. 2,[2] decreased to $5.00 per cwt. by Amendment No. 4[3] and further decreased to the original figure of $4.50 by Amendment No. 9.[4] Neither MPR 285 nor Amendments 2, 4 and 9 thereto were approved by the Secretary of Agriculture.

During 1942 and 1943 the complainant was engaged in the importation of bananas from the Dominican Republic. It ceased operations in December, 1943. On May 8, 1943 the complainant filed a protest against Amendment No. 2 to the regulation, which amendment had increased the differential in maximum prices for bananas from the Central American countries over prices for those from the Dominican Republic from $0.50 to $1.50 per cwt. The Price Administrator denied the protest and the complaint in this court in case No. 116 followed.

Following a hearing by this court in No. 116 the proceedings were stayed to await disposition by the Price Administrator of a second protest filed by the complainant on September 19, 1944 and amended March 28, 1945. In this protest the complainant attacked the validity of the regulation as well as the amendments thereto. The second protest, as amended, was denied and the complaint in No. 317 in this court followed. Rehearing was then ordered in No. 116 and the two cases were consolidated for hearing.

The complainant contends that the regulation and its amendments are invalid because they were promulgated and issued by the Price Administrator without the approval of the Secretary of Agriculture or of the War Food Administrator[5] as required by Section 3(e) of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 903(e). Subsection (e) of Section 3 of the Act, commonly referred to as the Bankhead Amendment, as originally enacted and in force during the period here relevant read:

"(e) Notwithstanding any other provision of this or any other law, no action shall be taken under this Act by the Administrator or any other person with respect to any agricultural commodity without the prior approval of the Secretary of Agriculture; except that the Administrator may take such action as may be necessary under section 202 and section 205 [(a) and (b)] to enforce compliance with any regulation, order, price schedule or other requirement with respect to an agricultural commodity which has been previously approved by the Secretary of Agriculture."

The language just quoted would seem to be so clear as to leave no room for con-

[1] 7 F.R. 10481, issued December 12, 1942.

[2] 8 F.R. 3050, issued March 10, 1943.

[3] 8 F.R. 16626, issued December 8, 1943.

[4] 9 F.R. 14106, issued November 28, 1944.

[5] Following the President's Executive Order No. 9322, issued March 26, 1943, 50 U.S.C.A.Appendix, § 601, note, 8 F.R. 3807, No. 9328, issued April 8, 1943, 50 U.S.C.A.Appendix, § 901, note, 8 F.R. 4681, and No. 9334, issued April 19, 1943, 50 U.S.C.A.Appendix, § 601 note, 8 F.R. 5423, transferring the authority of the Secretary of Agriculture under Section 3(e) of the Act to approve maximum price regulations to the War Food Administrator, approval by the War Food Administrator was the legal equivalent of approval by the Secretary of Agriculture. See California Lima Bean Growers Ass'n v. Bowles, 1945, Em.App., 150 F.2d 964.

struction.[6] If each word in the section is given its ordinary meaning it would follow, as contended by the complainant, that the approval of the Secretary of Agriculture was a condition precedent to the validity of the regulation by which the Price Administrator established maximum prices for bananas since they are unquestionably an agricultural commodity in the normal meaning of those words. The Administrator urges, however, that the words "any agricultural commodity" as used in the Bankhead Amendment should not be given their usual meaning but rather should be read as words of art so limited in scope as to exclude agricultural commodities imported into the United States. If the phrase "any agricultural commodity" does not apply to imports then a regulation which establishes maximum prices for imported bananas would not require the prior approval of the Secretary of Agriculture. It would follow, the Administrator argues, that MPR 285 and its amendments were not invalid by reason of the fact that they were issued by the Price Administrator without the approval of the Secretary of Agriculture. The issue between the complainant and the Administrator on this point is, therefore, reduced to the narrow question as to the meaning which is to be given the phrase "any agricultural commodity" as that phrase is used in Section 3(e) of the Act. We shall accordingly examine the reasons which the Administrator advances for his assertion that the phrase in question is not to be given its plain and ordinary meaning.

The Administrator asserts that when Congress used the phrase "any agricultural commodity" in Section 3 of the Act it meant only those commodities for which the Secretary of Agriculture had power to fix parity or comparable prices. He argues that the Secretary of Agriculture had neither the duty nor the authority to fix parity or comparable prices for any agricultural commodity not grown in the United States and he asserts that it necessarily follows that an imported commodity could never be an "agricultural commodity" within the meaning of the Bankhead Amendment. In support of his suggested construction of the Bankhead Amendment the Administrator primarily relies upon the proposition that the phrase "any agricultural commodity" is used as a term of art in that restricted sense throughout the whole of Section 3 of the Emergency Price Control Act, including subsection (e) thereof. He also claims to find support for his view in the reports of the debates in Congress on the Bankhead Amendment, in his own administrative practice, in an opinion of a federal district court, and in an advisory opinion of the solicitor for the Department of Agriculture.

In advancing his primary contention the Administrator points out that the phrase "any agricultural commodity" is used in four of the subsections of Section 3 and asserts, as we have said, that the phrase is used as a term of art in all of them. He argues that in subsections (a), (b) and (c) the phrase is used in the restricted sense for which he contends and he urges that it is necessary to the proper and unified construction of the section that the phrase be given that restricted meaning in subsection (e) also. Basic to this contention is the Administrator's assertion that Congress intended to give the phrase exactly the same meaning when using it in each of the subsections preceding subsection (e). For, as he thus recognizes, by a term of art is meant one which is used in a particular field with a precise technical meaning.[7] In testing the soundness of the premise upon which the Administrator's contention is based, therefore, it is necessary only to examine the preceding subsections to which he points in order to determine whether the

---

[6] Compare Thompson v. United States, 1918, 246 U.S. 547, 551, 38 S.Ct. 349, 62 L.Ed. 876; United States v. Missouri Pac. R. Co., 1929, 278 U.S. 269, 277, 49 S.Ct. 133, 73 L.Ed. 322; Wilbur v. United States, 1931, 284 U.S. 231, 237, 52 S.Ct. 113, 76 L.Ed. 261; Helvering v. City Bank Farmers Trust Co., 1935, 296 U.S. 85, 89, 56 S.Ct. 70, 80 L.Ed.

62; Addison v. Holly Hill Fruit Products Co., 1944, 322 U.S. 607, 617, 64 S. Ct. 1215, 88 L.Ed. 1488, 153 A.L.R. 1007.

[7] Cargill v. Thompson, 1894, 57 Minn. 534, 59 N.W. 638; 2 Sutherland, Statutory Construction, 3rd Ed. (1943), p. 437.

phrase "any agricultural commodity" is used in each of them in exactly the same sense.

Subsections (a), (b) and (c) of Section 3 are as follows:

"(a) No maximum price shall be established or maintained for any agricultural commodity below the highest of any of the following prices, as determined and published by the Secretary of Agriculture: (1) 110 per centum of the parity price for such commodity, adjusted by the Secretary of Agriculture for grade, location, and seasonal differentials, or, in case a comparable price has been determined for such commodity under subsection (b), 110 per centum of such comparable price, adjusted in the same manner, in lieu of 110 per centum of the parity price so adjusted; (2) the market price prevailing for such commodity on October 1, 1941; (3) the market price prevailing for such commodity on December 15, 1941; or (4) the average price for such commodity during the period July 1, 1919, to June 30, 1929.

"(b) For the purposes of this Act, parity prices shall be determined and published by the Secretary of Agriculture as authorized by law. In the case of any agricultural commodity other than the basic crops corn, wheat, rice, tobacco, and peanuts, the Secretary shall determine and publish a comparable price whenever he finds, after investigation and public hearing, that the production and consumption of such commodity has so changed in extent or character since the base period as to result in a price out of line with parity prices for basic commodities.

"(c) No maximum price shall be established or maintained for any commodity processed or manufactured in whole or substantial part from any agricultural commodity below a price which will reflect to producers of such agricultural commodity a price for such agricultural commodity equal to the highest price therefor specified in subsection (a)."

It will be observed that subsections (a) and (c) are similar in that each imposes a specific limitation upon the power of the Administrator to establish maximum prices for "any agricultural commodity", or com-

modity processed therefrom, as the case may be. Subsection (b) on the other hand is directed to a different object. Its purpose is to impose upon the Secretary of Agriculture the duty to determine and publish parity or comparable prices.

It will be seen that subsections (a) and (c), impose a limitation upon the maximum prices which may be fixed for the agricultural commodities to which the subsections refer. If read literally as applying to all agricultural commodities the subsections would operate to prevent the Administrator from fixing any maximum prices for agricultural commodities (or commodities processed therefrom) for which parity or comparable prices have not previously been determined by the Secretary of Agriculture. For it is obvious that the limiting figure which the subsections impose upon the Administrator's action with respect to an agricultural commodity could not be ascertained and applied in the absence of its principal element, the parity or comparable price of the commodity. It seems clear, therefore, that the phrase "any agricultural commodity" as used in these two subsections must be limited by the context to refer to those agricultural commodities only for which parity or comparable prices have actually been determined and published and that the restriction which these subsections impose upon the Administrator's power to control the prices of agricultural commodities must be construed as limited to those particular agricultural commodities. We took this view in California Lima Bean Growers Ass'n v. Bowles, 1945, Em.App., 150 F.2d 964, and we still adhere to it.

We think that Congress recognized this limitation upon the meaning of the phrase "any agricultural commodity" in subsections (a) and (c) when in the First Supplemental National Defense Appropriation Act approved July 25, 1942, it attached to the appropriation made to the Office of Price Administration the proviso

"That no part of this appropriation shall be used to enforce any maximum price or prices on any agricultural commodity or any commodity processed or manufactured in whole or substantial part from any agricultural commodity unless and until (1) the Secretary of Agriculture has determined

and published for such agricultural commodity the prices specified in section 3(a) of the Emergency Price Control Act of 1942; (2) in case of a comparable price for such agricultural commodity, the Secretary of Agriculture has held public hearings and determined and published such comparable price in the manner prescribed by section 3(b) of said Act; and (3) the Secretary of Agriculture has determined after investigation and proclaimed that the maximum price or prices so established on any such agricultural commodity will reflect to the producer of such agricultural commodity a price in conformity with section 3(c) of said Act: Provided further, That in the case of a maximum price or maximum prices heretofore established the provisions of the foregoing proviso shall not apply until the expiration of sixty days after the date of enactment of this Act."[8]

This whole proviso is evidently based upon the premise that the Administrator could lawfully fix maximum prices for agricultural commodities (or commodities processed therefrom) without regard to the limitations of subsections (a) and (c), in the case of those agricultural commodities for which parity or comparable prices had not actually been determined.

When we turn to subsection (b) of Section 3, however, it is obvious that the phrase "any agricultural commodity" is used with a quite different and much broader meaning. In this subsection it clearly comprehends agricultural commodities for which parity or comparable prices have not been determined or published by the Secretary of Agriculture, since its principal purpose is to direct him to make such determinations and publications in appropriate cases.

■ It will thus be seen that the phrase "any agricultural commodity" is used in one very restricted sense in subsections (a) and (c) and in another and much broader sense in subsection (b). In each case the normal and inclusive meaning of the phrase is limited by the particular context in which it is used. We are thus compelled to the conclusion that Congress did not use the phrase "any agricultural commodity" as a phrase of art with a uniform meaning in all the various subsections of Section 3, but that on the contrary it was used in each subsection in its ordinary meaning limited only by the particular context. In subsection (c), however, the context imposes no limitation upon the normal meaning of the phrase. On the contrary, as we shall later see, there are valid reasons for thinking that Congress may well have intended the phrase as used in subsection (e) to have its broadest possible meaning. We, therefore, reject the Administrator's contention that the phrase "any agricultural commodity" was used in Section 3 as a phrase of art and that it must for that reason be given a limited meaning in subsection (e).

■ The Administrator points to the use of the same phrase in Section 3 of the Stabilization Act of 1942, 50 U.S.C.A.Appendix, § 963. But that act was not passed until October 2, 1942, more than eight months after the passage of the Emergency Price Control Act. It can, therefore, throw no light on the question as to what Congress meant by the phrase when it used it in subsections (a), (b), (c) and (e) of Section 3 on January 30, 1942.

We turn then to consider the other reasons advanced by the Administrator in support of his contention that a restricted meaning must be given to the phrase in question in subsection (e). The debates on the Emergency Price Control Act prove conclusively, the Administrator says, that in the enactment of each of its provisions dealing with agricultural commodities Congress was concerned solely with the interests of the farm economy of the continental United States and that it entrusted to the Secretary of Agriculture the guardianship of the economic welfare of the American farmer only. It follows, the Administrator argues, that the Secretary of Agriculture was intended to have no duty with respect to imported agricultural commodities.

We have examined the legislative history of the act with great care. Subsection (e) of Section 3 was first proposed in the Senate by Senator Bankhead as an amendment

[8] 56 Stat. 712, 713.

to the House bill and it was retained in conference.[9] The Bankhead Amendment was debated at great length on the floor of both the Senate and the House of Representatives. It clearly appears, as asserted by the Administrator, that the amendment was intended to retain for the American farmer all the protections which Congress had accorded him in prior legislation. It also appears that the proponents of the amendment preferred to entrust the task of safeguarding those rights to the Secretary of Agriculture, an official traditionally concerned with the welfare of the farmer, rather than to the Price Administrator, a new and untried official.

There was nothing said in Congress, however, as to what factors the Secretary of Agriculture should take into consideration in forming his judgment as to whether to give or withhold his approval to a proposed price regulation for an agricultural commodity. No one expressed the view that in fulfilling the task which Congress entrusted to the Secretary of Agriculture that official was to be without power to exercise any control over a proposed maximum price for an imported agricultural commodity to be sold in continental United States even though in his judgment those prices would adversely affect the price for domestic agricultural commodities. We find nothing in the legislative history of the Bankhead Amendment which calls for the conclusion that the amendment was not intended to extend the duty of the Secretary of Agriculture to imported agricultural commodities.

The Administrator asserts that from the inception of price control he has never submitted price regulations establishing maximum prices for imported commodities such as cocoa, coffee or bananas to the Secretary of Agriculture for prior approval and urges that Congress in subsequent legislation has not indicated that it disagreed with this course of action. The argument is entitled to little weight. There is nothing to indicate that the negative course of action of the Administrator was brought to the attention of Congress either in the committee hearings or on the floor of the House or Senate when the extension of the Emergency Price Control Act was being considered. Section 3(e) was in fact amended in other respects in June, 1944 and again in June, 1945 but the comprehensive phrase "any agricultural commodity" was not modified so as to bring it into conformity with the narrow interpretation which the Administrator now urges.

Moreover, involved in this case is not the effect to be given to an administrative interpretation entered in an adversary proceeding but only that to be given to an administrative practice which was not even affirmatively announced by an official ruling. In Fishgold v. Sullivan Drydock & Repair Corp., 1946, 328 U.S. 275, at page 290, 66 S.Ct. 1105, 1113, the court took note of this distinction:

"The ruling of the Director [of Selective Service] may be resorted to for guidance. See Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124; Mabee v. White Plains Pub. Co., 327 U.S. 178, 66 S.Ct. 511. But his rulings are not made in adversary proceedings and are not entitled to the weight which is accorded interpretations by administrative agencies entrusted with the responsibility of making inter partes decisions."

The Administrator cites and relies upon the opinion of the United States District Court for the District of Connecticut in Brown v. Banana Distributors of Connecticut, Inc., D.C., 1943, 52 F.Supp. 804. That case involved a civil enforcement action in which the Administrator filed a complaint alleging that the defendant had violated MPR 285. The defendant moved to dismiss the complaint upon several grounds, one of which was that the regulation lacked the approval of the Secretary of Agriculture. The court refused to dismiss, ruling that the term "agricultural commodity" as

---

[9] H.R.No.1658, 77th Cong., 2d Sess., Statement of House Conferees, p. 23.

"The provisions of the Senate Amendment requiring action of the Administrator with respect to any agricultural commodity to have the prior approval of the Secretary of Agriculture is re- tained, but it is made clear that action which is thus subject to such approval does not include action to enforce compliance with a regulation or order of the Administrator previously approved by the Secretary of Agriculture."

used in Section 3(e) of the Act does not include imported agricultural commodities and that a price regulation establishing maximum prices for imported bananas is not invalid because it lacks the approval of the Secretary of Agriculture.

This ruling does not have authoritative weight in so far as it purports to adjudicate the validity of the regulation. An attack upon a price regulation for an agricultural commodity upon the ground that the regulation had not been approved by the Secretary of Agriculture is an attack upon its validity. The determination of questions as to the validity of a price regulation has been confided to the exclusive jurisdiction of this court. Compare Shrier v. United States, 6 Cir., 1945, 149 F.2d 606, certiorari denied 326 U.S. 728, 66 S.Ct. 34. The regulation for the purposes of the action in the district court should have been treated as valid unless and until declared invalid by this court or the Supreme Court. Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Lockerty v. Phillips, 1943, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339; United States v. George F. Fish, Inc., 2 Cir., 1946, 154 F.2d 798.

The Administrator also relies upon an advisory opinion of the solicitor of the Department of Agriculture [10] to support his contention. In that opinion the solicitor, replying to an inquiry by the Secretary of Agriculture, as to his duties under Section 3 of the Act, concluded that "commodities imported" were not "agricultural commodities." A careful reading of the opinion discloses, however, that the solicitor was not directing his attention to the problem presented by subsection (e) of Section 3 of the Act as to the responsibility of the Secretary with respect to the approval of price regulations for agricultural commodities. The emphasis throughout is upon the question whether certain commodities come within subsections (a), (b) and (c) of Section 3. In his introductory statement, for example, the solicitor refers to the duties of the Secretary "under that portion of the First Supplemental National Defense Appropriation Act, * * * dealing with the Office of Price Administration appropriation * * *," which as we have seen, refers specifically to subsections (a), (b) and (c), but not to subsection (e).

We are not persuaded by any of the reasons advanced by the Administrator to support his view that a regulation establishing maximum prices for an agricultural commodity is valid though issued without the approval of the Secretary of Agriculture if the commodity sought to be regulated is imported rather than domestically grown. On the contrary we are of the opinion that the phrase "any agricultural commodity" as used in the Bankhead Amendment must be given its ordinary comprehensive meaning and that it, therefore, includes imported agricultural commodities, among them bananas.

We think, moreover, that there are persuasive reasons why the Bankhead Amendment must be construed so as to require approval of the Secretary of Agriculture in the case of imported as well as domestic agricultural commodities. One such reason may be found in the purpose of the amendment. It is of course true that in reaching a decision as to whether to give or withhold his approval to a maximum price about to be fixed by the Price Administrator for an agricultural commodity grown in the United States the Secretary is guided by the need to protect the interests of the American farmer. It must be remembered, however, that many agricultural commodities which are domestically produced are also imported in substantial quantities.[11] It would seem clear that the Secretary's judgment and experience and his comprehensive plans for the protection of the American farmer might quite properly cause him to conclude that the price of a domestic agricultural commodity could not be maintained at an adequate level if the imported agri-

[10] Opinion of Solicitor, U. S. Department of Agriculture, Opinion No. 4434, dated August 22, 1942.

[11] Bananas, the subject of the regulation here involved, are produced commercially in Hawaii and Puerto Rico and are exported to some extent to the continental United States, as appears from the United States Department of Agriculture Statistics, 1946, p. 171, Table 218—Bananas: United States Supply. 1929–45.

cultural commodity were to be sold at a lower maximum price.

In point, we think, is the complainant's illustration involving avocados, grown in Florida and California, and presently on the parity list. A regulation establishing maximum prices for such domestic avocados would require the approval of the Secretary of Agriculture. Might it not be essential to the maintenance of the price which the Secretary of Agriculture deemed necessary to protect the domestic growers of avocados that the maximum prices fixed for avocados imported from Cuba should not be so low as to preempt the American market for avocados? We think the implications are the same in the case of bananas even though bananas are not grown commercially in the continental United States.[12] Bananas occupy a relatively important position on the Bureau of Labor Statistics cost-of-living index.[13] If the Administrator were to establish a low maximum price for bananas consumers might purchase that fruit, to the extent it was available, in lieu of home grown fruits having relatively higher maximum prices, thus tending to depress the prices of the domestically produced agricultural commodity below the level which the Secretary of Agriculture deemed adequate to maintain the economic welfare of the American farmer.

We think it of some significance that when Congress intended to make a distinction between domestically produced and import-

ed agricultural commodities it did not leave the matter to the interpretation and practice of the officials entrusted with administering the Act. For example in Section 2(e) of the Act, 50 U.S.C.A.Appendix, § 902(e), the Administrator is authorized to "make subsidy payments to domestic producers of such commodity". Later in the same subsection it is provided that "In any case in which a commodity is domestically produced, the powers granted to the Administrator by this subsection shall be exercised with respect to importations of such commodity only to the extent that, in the judgment of the Administrator, the domestic production of the commodity is not sufficient to satisfy the demand therefor."

We hold that Section 3(e) of the Act means what it plainly says, namely, that any action taken by the Administrator with respect to any commodity which is a product of the soil must have the prior approval of the Secretary of Agriculture. We accordingly conclude that MPR 285 and amendments 2, 4 and 9 thereto are invalid by reason of the failure of the Price Administrator to secure the prior approval thereto of the Secretary of Agriculture or of the War Food Administrator. In view of this conclusion it becomes unnecessary to discuss the other grounds of invalidity suggested by the complainant.

Judgments will be entered declaring Maximum Price Regulation No. 285 and Amendments 2, 4 and 9 thereto invalid ab initio.

[12] They are, however, grown in Hawaii and Puerto Rico. See note 11.
[13] United States Department of Labor, Bureau of Labor Statistics, Monthly Labor Review, Vol. 56, p. 172, Vol. 58, p. 868, February 1947, p. 286.