FLEMING, TEMPORARY CONTROLS ADMINIS-
TRATOR, *v.* MOHAWK WRECKING & LUMBER
CO. ET AL.

NO. 583.

Argued April 1, 1947.—Decided April 28, 1947.

*David London* argued the cause for petitioner in No. 583 and respondent in No. 512. With him on the brief were *Acting Solicitor General Washington, John R. Benney, Philip Elman, William E. Remy, Samuel Mermin* and *Jacob W. Rosenthal.*

*John W. Babcock* argued the cause and filed a brief for respondents in No. 583.

*Paul Flaherty* and *C. L. Dawson* submitted on brief for petitioners in No. 512.

*Arthur E. Pettit, Paul R. Stinson, Arthur Mag* and *Dick H. Woods* filed a brief in No. 583 for the Singer Sewing Machine Company, as *amicus curiae,* in support of respondents' motion to vacate the order of substitution.

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE BLACK.

These cases present the question whether the Emergency Price Control Act, 56 Stat. 23, as amended, 50 U. S. C. App. Supp. V, § 901 *et seq.,* authorizes the Administrator to delegate to district directors authority to sign and issue subpoenas.   In the first of these cases the Circuit Court of Appeals for the Sixth Circuit held that such authority did not exist, 156 F. 2d 891; in the second, the Court of Appeals for the District of Columbia held that it did.   81 U. S. App. D. C. 156, 156 F. 2d 561.   The cases are here on petitions for writs of certiorari which we granted to resolve the conflict.

*First.*  After we granted the petitions we ordered, on motion of the Acting Solicitor General, that Philip B. Fleming, Temporary Controls Administrator, be substituted as a party in each case in place of Paul A. Porter, Administrator, Office of Price Administration, resigned. Thereafter respondents in the first of these cases filed a motion to vacate the order of substitution, a motion which we deferred to the hearing on the merits.[1]  The question

---

[1] Compare *Porter* v. *American Distilling Co.,* 71 F. Supp. 483; *Porter* v. *Bowers,* 70 F. Supp. 751, and *Bowles* v. *Ell-Carr Co., Inc.,* 71 F. Supp. 482, with *Porter* v. *Wilson,* 69 F. Supp. 447, and *Porter* v. *Hirahara,* 69 F. Supp. 441.

has now been briefed and argued and we conclude that the motion to vacate the order of substitution should be denied.

The Act was amended in 1946 to provide for its termination not later than June 30, 1947, saving, however, rights and liabilities incurred prior to the termination date.[2] By November 12, 1946, almost all commodities (including services) were by administrative order [3] made exempt from price control.[4] Price control had thus entered a temporary transition period. On December 12, 1946, the President issued an Executive Order "for the purpose of further effectuating the transition from war to peace and in the interest of the internal management of the Government." That order consolidated the Office of Price Administration and three other agencies into the Office of Temporary Controls [5]—an agency in the Office for Emergency Management of the Executive Office of the President. The latter had previously been established pursuant to the Reorgani-

---

[2] 60 Stat. 664. Section 1 (b) now provides:

"The provisions of this Act, and all regulations, orders, price schedules, and requirements thereunder, shall terminate on June 30, 1947, or upon the date of a proclamation by the President, or upon the date specified in a concurrent resolution by the two Houses of the Congress, declaring that the further continuance of the authority granted by this Act is not necessary in the interest of the national defense and security, whichever date is the earlier; except that as to offenses committed, or rights or liabilities incurred, prior to such termination date, the provisions of this Act and such regulations, orders, price schedules, and requirements shall be treated as still remaining in force for the purpose of sustaining any proper suit, action, or prosecution with respect to any such right, liability, or offense."

[3] Express provisions for decontrol were added by the 1946 amendments. See, for example, § 1a (b)–(h).

[4] See Supplementary Order 193, November 12, 1946, 11 Fed. Reg. 13464, as amended November 19, 1946, 11 Fed. Reg. 13637.

[5] Exec. Order No. 9809, 11 Fed. Reg. 14281.

zation Act of 1939.[6]  The Executive Order provided a Temporary Controls Administrator, appointed by the President, to head the Office of Temporary Controls and vested in him, *inter alia,* the functions of the Price Administrator, including the authority to maintain in his own name civil proceedings, whether or not then pending, relating to matters theretofore under the jurisdiction of the Price Administrator.  Petitioner is the Temporary Controls Administrator appointed by the President.

It is argued that the President had no authority to transfer the functions of the Price Administrator to another agency and to vest in an officer appointed by the President the power which the Emergency Price Control Act, § 201, had conferred upon an Administrator appointed by the President by and with the advice and consent of the Senate.  And it is said that even though such authority existed, it came to an end with the cessation of hostilities.

By § 1 of the First War Powers Act of 1941, 55 Stat. 838, 50 U. S. C. App. Supp. V, § 601, the President is

> "authorized to make such redistribution of functions among executive agencies as he may deem necessary, including any functions, duties, and powers hitherto by law conferred upon any executive department, commission, bureau, agency, governmental corporation, office, or officer, in such manner as in his judgment shall seem best fitted to carry out the purposes of this title, and to this end is authorized to make such regulations and to issue such orders as he may deem necessary . . ."

That power may be exercised "only in matters relating to the conduct of the present war," § 1, and expires six months after "the termination of the war."  § 401.

---

[6] See Reorganization Plan I, 5 U. S. C. § 133t (note); 4 Fed. Reg. 3864; 6 Fed. Reg. 192.

On December 31, 1946, after the creation of the Office of Temporary Controls, the President, while recognizing that "a state of war still exists," by proclamation declared that hostilities had terminated.[7] The cessation of hostilities does not necessarily end the war power. It was stated in *Hamilton* v. *Kentucky Distilleries & W. Co.,* 251 U. S. 146, 161, that the war power includes the power "to remedy the evils which have arisen from its rise and progress" and continues during that emergency. *Stewart* v. *Kahn,* 11 Wall. 493, 507. Whatever may be the reach. of that power, it is plainly adequate to deal with problems of law enforcement which arise during the period of hostilities but do not cease with them. No more is involved here.

Section 1 of the First War Powers Act does not explicitly provide for creation of a new agency which consolidates the functions and powers previously exercised by one or more other agencies. But the Act has been repeatedly construed by the President to confer such authority.[8] Such construction by the Chief Executive, being both contemporaneous and consistent, is entitled to great weight. See *United States* v. *Jackson,* 280 U. S. 183, 193; *Billings* v. *Truesdell,* 321 U. S. 542, 552–553. And the appropriation by Congress of funds for the use of such agencies stands as confirmation and ratification of the action of the Chief Executive. *Brooks* v. *Dewar,* 313 U. S. 354, 361.

---

[7] Proclamation 2714, 12 Fed. Reg. 1.

[8] Each of the following agencies was a new agency created by Executive Order to exercise powers formerly vested in other agencies or to perform new functions: National Housing Agency, Exec. Order No. 9070, 7 Fed. Reg. 1529; War Food Administration, Exec. Order No. 9334, 8 Fed. Reg. 5423; Office of War Mobilization, Exec. Order No. 9347, 8 Fed. Reg. 7207; Office of Economic Warfare, Exec. Order No. 9361, 8 Fed. Reg. 9861; Foreign Economic Administration, Exec. Order No. 9380, 8 Fed. Reg. 13081; Surplus War Property Administration, Exec. Order No. 9425, 9 Fed. Reg. 2071.

Nor do we think there is merit in the contention that the First War Powers Act gave the President authority to transfer functions only from agencies in existence when that Act became law. It is true that § 1 authorizes the President "to make such redistribution of functions among executive agencies as he may deem necessary, including any functions, duties, and powers hitherto by law conferred upon" any agency. But the latter clause is only an illustration of the authority granted, not a limitation on it. It makes clear that the authority extends to existing agencies as well as to others. That construction is supported by § 5 of the Act which states that upon its termination all executive and administrative agencies "shall exercise the same functions, duties, and powers as heretofore or as hereafter by law may be provided, any authorization of the President under this title to the contrary notwithstanding." As stated by the Emergency Court of Appeals, unless § 1 authorizes the President to redistribute functions of agencies created after the passage of the Act, the reference in § 5 to functions "hereafter" provided by law is "wholly meaningless." *California Lima Bean Growers Assn.* v. *Bowles,* 150 F. 2d 964, 967. Nor is that result affected by the subsequent enactment of the Emergency Price Control Act which in § 201 (b) authorized the President to transfer any of the powers and functions of the Office of Price Administration "with respect to a particular commodity or commodities" to any government agency having other functions relating to such commodities. Whatever effect that provision may have, it does not purport to deal with general enforcement functions and so restricts in no way the authority of the President under the First War Powers Act to transfer them. Yet enforcement functions are all that are involved in the present cases.

We need not decide whether under the First War Powers Act the President had authority to transfer functions of an officer who need be confirmed by the Senate to one appointed by the President without Senate confirmation. For § 2 of that Act provides:

"That in carrying out the purposes of this title the President is authorized to utilize, coordinate, or consolidate any executive or administrative commissions, bureaus, agencies, governmental corporations, offices, or officers now existing by law, to transfer any duties or powers from one existing department, commission, bureau, agency, governmental corporation, office, or officer to another, to transfer the personnel thereof or any part of it either by detail or assignment, together with the whole or any part of the records and public property belonging thereto."

The authority to "utilize . . . offices, or officers now existing by law" is sufficient to sustain the transfer of functions under the Executive Order from Porter, resigned, to Fleming. For prior to the Act Fleming had been appointed by the President and confirmed by the Senate as Federal Works Administrator.[9] He thus was the incumbent of an office "existing by law" at the time of the passage of the Act and by virtue of § 2 could be the lawful recipient through transfer by the President of the functions of other agencies as well. To hold that an officer, previously confirmed by the Senate, must be once more confirmed in order to exercise the powers transferred to him by the President would be quite inconsistent with the broad grant of power given the President by the First War Powers Act. Any doubts on this score would, moreover, be removed by the recognition by Congress in a recent appropriation of the status of the Temporary Controls Ad-

[9] December 4, 1941.   See 87 Cong. Rec. 9413.

ministrator.[10]   That recognition was an acceptance or ratification by Congress of the President's action in Executive Order No. 9809.   *Swayne & Hoyt, Ltd.* v. *United States,* 300 U. S. 297, 301–302; *Brooks* v. *Dewar, supra.*

For these reasons Fleming is a successor in office of Porter and may be substituted as a party under Rule 25, Rules of Civil Procedure.   The rule requires a showing of "substantial need" for continuing and maintaining the action.   Though most of the controls have been lifted, the Act is still in effect.   Liabilities incurred prior to the lifting of controls are not thereby washed out. *United States* v. *Hark,* 320 U. S. 531, 536; *Utah Junk Co.* v. *Porter,* 328 U. S. 39, 44; *Collins* v. *Porter,* 328 U. S. 46, 49.   And Congress has explicitly provided that accrued rights and liabilities under the Emergency Price Control Act are preserved whether or not suit is started prior to the termination date of the Act.[11]   If investigation were foreclosed at this stage, such rights as may exist would be defeated, contrary to the policy of the Act.

*Second.* We come then to the merits.   The Administrator, by order, delegated the function of signing and issuing

---

[10] 61 Stat. 14, 16, under the heading "Executive Office of the President, Office for Emergency Management," the following:

"Office of Temporary Controls

"Salaries and expenses: For an additional amount, fiscal year 1947, for the Office of Price Administration transferred by Executive Order 9809 of December 12, 1946, to the Office of Temporary Controls, $7,051,752, to be available for the payment of terminal leave only: *Provided,* That it is the intent of the Congress that the funds heretofore and herein appropriated shall include all expenses incident to the closing and liquidation of the Office of Price Administration and the Office of Temporary Controls by June 30, 1947."

[11] See § 1 (b) *supra,* note 2.   And for the general statute preventing the extinguishment of liability under a repealed statute, unless the repealing act expressly provides for it, see Rev. Stat. § 13, as amended, 58 Stat. 118, 1 U. S. C. Supp. V, § 29.

subpoenas to regional administrators and district directors.[12] Section 201 (a) of the Emergency Price Control Act provides in part:

> "The Administrator may, subject to the civil-service laws, appoint such employees as he deems necessary in order to carry out his functions and duties under this Act, and shall fix their compensation in accordance with the Classification Act of 1923, as amended."

Section 201 (b) of the Act provides:

> "The principal office of the Administrator shall be in the District of Columbia, but he or any duly authorized representative may exercise any or all of his powers in any place."

Practically identical provisions were included in § 4 (b) and (c) of the Fair Labor Standards Act, 52 Stat. 1060, 1061–1062, 29 U. S. C. § 204. The Court held in *Cudahy Packing Co.* v. *Holland,* 315 U. S. 357, that the latter provisions did not authorize the Administrator under that Act, to delegate his power to sign and issue subpoenas. Accordingly the main controversy here is whether the *Cudahy* decision controls this case. We do not think it does.

The legislative history of the Act involved in the *Cudahy* case showed that a provision granting authority to delegate the subpoena power had been eliminated when the bill was in Conference. On the other hand, the Senate Committee in reporting the bill that became the Emergency Price Control Act described § 201 (a) as authorizing the Administrator to "perform his duties through such employees or agencies by delegating to them any of the powers given to him by the bill." And it said that § 201 (b) authorized him or "any representative or other agency

---

[12] Revised General Order 53, May 13, 1944, 9 Fed. Reg. 5191.

to whom he may delegate any or all of his powers, to exercise such powers in any place." S. Rep. No. 931, 77th Cong., 2d Sess., pp. 20–21. In the *Cudahy* case the Act made expressly delegable the power to gather data and make investigations, thus lending support to the view that when Congress desired to give authority to delegate, it said so explicitly. In the present Act, there is no provision which specifically authorizes delegation as to a particular function. In the *Cudahy* case, the Act made applicable to the powers and duties of the Administrator the subpoena provisions of the Federal Trade Commission Act, §§ 9 and 10, 38 Stat. 722, 723, 15 U. S. C. §§ 49 and 50, which only authorized either the Commission or its individual members to sign subpoenas. The subpoena power under the present Act is found in § 202 (b)[13] and is not dependent on the provisions of another Act having a history of its own. The Act involved in the *Cudahy* case granted no broad rule-making power. Section 201 (d) of the present Act, however, provides:

> "The Administrator may, from time to time, issue such regulations and orders as he may deem necessary or proper in order to carry out the purposes and provisions of this Act."

Such a rule-making power may itself be an adequate source of authority to delegate a particular function, unless by express provision of the Act or by implication it has been withheld. See *Plapao Laboratories* v. *Farley*, 67 App. D. C. 304, 92 F. 2d 228. There is no provision in the present Act negativing the existence of such authority, so far as the subpoena power is concerned. Nor can the

---

[13] Section 202 (b) provides in part:

"The Administrator may administer oaths and affirmations and may, whenever necessary, by subpena require any such person to appear and testify or to appear and produce documents, or both, at any designated place."

absence of such authority be fairly inferred from the history and content of the Act. Thus the presence of the rule-making power, together with the other factors differentiating this case from the *Cudahy* case, indicates that the authority granted by § 201 (a) and (b) should not be read restrictively.

As stated by the court in *Porter* v. *Murray*, 156 F. 2d 781, 786–787, the overwhelming nature of the price control program entrusted to the Administrator suggests that the Act should be construed so as to give it the administrative flexibility necessary for prompt and expeditious action on a multitude of fronts. The program of price control inaugurated probably the most comprehensive legal controls over the economy ever attempted. We would hesitate to conclude that all the various functions granted the Administrator need be performed personally by him or under his personal direction. Certainly, so far as the investigative functions were concerned, he could hardly be expected, in view of the magnitude of the task,[14] to exercise

---

[14] The following statistics indicate the volume of litigation and investigations involved:

|  | 1943 | 1944 | 1945 | 1946 |
|---|---|---|---|---|
| Civil Cases commenced by United States in District Courts under Emergency Price Control Act.* (Fiscal years ending June 30)... | 2, 219 | 6, 524 | 28, 283 | 31, 094 |
| Investigations completed by Office of Price Administration.** (Calendar years) . | 652, 851 | 333, 151 | 193, 348 | 106, 240† |

*(Rep. Dir. Adm. Off. U. S. Courts (1943) Table 7; *Id.* 1944 Table 7; *Id.* (1945) Table C3; *Id.* (1946) Table C3.)

**(Quarterly Rep. O. P. A.: Eighth, p. 71; Twelfth, p. 75; Seventeenth, p. 104; Eighteenth, p. 82; Nineteenth, p. 95.)

†First nine months only.

his personal discretion in determining whether a particular investigation should be launched. Delay might do injury beyond repair. The pyramiding in Washington of all decisions on law enforcement would be apt to end in paralysis. To tempt the Administrator to solve the problem by supplying all his offices with subpoenas signed in blank would not further the development of orderly and responsible administration. These considerations reinforce the construction of the Act which allows the Administrator authority to delegate his subpoena power.

The other objections to the subpoenas are without merit.

We reverse the judgment in *Fleming* v. *Mohawk Wrecking & Lumber Co.,* and affirm the judgment in *Raley* v. *Fleming.*

*So ordered.*

MR. JUSTICE JACKSON, concurring.

I concur in the opinion and result. But the issue here is so related to other problems that I desire to state my grounds.

I would be reluctant to adopt a construction of an Act, such as the Emergency Price Control Act, which would certainly impede its administration unless it were necessary to carry out the intent of Congress or to protect fundamental individual rights.

If the Administrator may not delegate his power to sign subpoenas but must personally sign all subpoenas issued in the process of enforcement throughout the United States, one of two practices would be certain to result. He might sign large batches of blank subpoenas and turn them over to subordinates to be filled in over his signature. Or he might sign batches of subpoenas already made out by subordinates, probably without reading them and certainly without examining the causes for their issuance or

124

the scope of the information required. The personal signature of the Administrator on the subpoena under those circumstances is no protection to individual rights.

Of all the subpoenas issued by administrative authority, a very small percentage are contested. The important thing for protection of the individual is that when he does have reasons for resisting obedience he can obtain a hearing. I am in doubt as to whether under this Act and the regulations for its administration a person who has reasons for resisting the subpoena has any administrative review or remedy. But in any event he cannot be punished for contempt until a court order for its enforcement has issued and has been disobeyed.

Enforcement of such subpoenas by the courts is not and should not be automatic. So long as they are subject to full inquiry at this point it does not seem to me important to the individual or inconsistent with the policy of Congress that the subpoena issue by a subordinate of the Administrator. If the courts were to be shorn of their power of independent inquiry before enforcement, and I have thought we were tending that way, *cf.* dissent in *Penfield Co. v. S. E. C.,* 330 U. S. 585, I should expect Congress to intend greater responsibility at the point of original issue. I concur only because I think adequate judicial safeguards exist.