### NATIONAL LABOR RELATIONS BOARD

v.

**PESANTE et al.**

No. 16030.

United States District Court
S. D. California, Central Division.
Feb. 17, 1954.

Geo. J. Bott, General Counsel, David P. Findling, Associate General Counsel, Washington, D. C., Charles K. Hackler, Chief Law Officer, Geo. H. O'Brien & Ernest L. Heimann, Attorneys, National Labor Relations Board, Los Angeles, Cal., for N. L. R. B.

Hill, Farrer & Burrill, Los Angeles, Cal., Carl M. Gould, J. Rex Dibble, Los Angeles, Cal., for respondents.

HALL, District Judge.

The National Labor Relations Board seeks an order requiring obedience to 30 subpoenas issued in connection with a "representation proceeding" before it under Section 9(a, c) of the Taft-Hartley Act, 29 U.S.C.A. § 159.

On January 27, 1954, I signed an order for judgment for the plaintiff overruling the objections of the defendants. The basis of the order was that the petition to the Board to revoke the subpoena had not been filed within the five days required by Section 11 of the Taft-Hartley Act, 29 U.S.C.A. § 161. On motion to vacate, attention was directed to provisions of the regulations prescribed by the Board, 29 Code of Federal Regulations § 102.1 et seq., which permit an additional 3 days where service is made by mail, as the subpoenas were in this instance, and omits the counting of the Sundays and holidays between the first and last day. The subpoenas were deposited in the mail on September 25, 1953. By the correct calculations made under 29 C.F.R. § 102.81 and § 102.83, the time to have filed the petition to revoke the subpoenas would have expired on October 8, 1953. The petition was in fact filed on October 6, 1953. Consequently the petition to revoke the subpoenas was filed within the time required by the statute and my previous ruling was in error. The Order of January 27, 1954 is, therefore, vacated.

On June 18, 1953, a charge was filed against McMahan Furniture Co., 317 American Avenue, Long Beach, California, in a case given No. 21–CA–1719, alleging certain "unfair labor practices" under Section 10 of the Taft-Hartley Act, 29 U.S.C.A. § 160. On August 24, 1953, this charge was withdrawn. The subpoenas involved in the instant proceeding were not issued in connection with that charge, but it is mentioned in view of the fact that voluntary disclosures were sought while it was still pending.

In the meanwhile, on July 22, 1953, a petition for a "representation" proceeding under Section 9(c) (A) was filed by the President of the Long Beach Local (692) of the Teamsters' Union against three McMahan stores only, viz.: "McMahan Furniture Company, 317 American Avenue, Long Beach, 1895 E. Anaheim, Long Beach, 909 Avalon Blvd., Wilmington." Nothing is said in either the petition or the notice of hearing which was dated September 23, 1953 and set for hearing on October 15, 1953 at 111 West Seventh St., Los Angeles, about any of the other 26 different stores located in the 24 other cities covered by the subpoenas now sought to be enforced.

One subpoena is directed to an individual, viz., Pesante, and the others to 29 different retail organizations using the name "McMahan" in connection with furniture and appliance businesses (whether individuals doing business under fictitious name, or partnerships or corporations, does not appear). Twenty-eight of them are located in Southern California and one in Phoenix, Arizona. The 29 stores are located in 26 different cities, Phoenix, Arizona, and the following cities located in Southern California, viz., Santa Monica, Long Beach, Wilmington, Bakersfield, Taft, Delano, Wasco, Eagle Rock, Inglewood, Huntington Park, Pasadena, Burbank, Van Nuys, San Fernando, Santa Paula, Glendale, Santa Barbara, San Luis Obispo, Ventura, Santa Maria, Oxnard, Monrobia, El Monte, Bellflower and North Hollywood.

No proceedings are now, or at any time herein involved have been pending against any of such organizations and none of them are "parties" under 29 C.F.R. § 102.8 to the above proceeding, except the two stores in Long Beach and the one store in Wilmington. Pesante, the individual subpoenaed, is likewise not such a "party."

The subpoenas are signed by rubber stamp, one having the name Ivar H. Peterson, a member of the National Labor Relations Board, and all of the others, Abe Murdock, a member of the National Labor Relations Board, thereon. They are all dated Washington, D. C., and recite "In testimony whereof, the seal of the National Labor Relations Board is affixed hereto, and the undersigned, a member of said National Labor Relations Board, has hereunto set his hand at Washington, D. C., this 25th

day of September 1953" appearing immediately above the rubber stamped name of the Board member.

The subpoenas have no imprint seal but have printed on the paper a reproduction of a seal of the National Labor Relations Board.

It is conceded that neither Mr. Peterson nor Mr. Murdock signed the subpoenas; that no member of the Board "set his hand" to the subpoenas *at Washington, D. C.,* on September 25, 1953, but a batch of rubber stamped blank subpoenas were previously furnished to the Regional Director's Office and they were filled in by Ernest Heimann, one of counsel for Regional Director, 21st Region, National Labor Relations Board, without any personal authorization from the National Labor Relations Board or any member thereof: and that Heimann requested authority of the Regional Director to do so. All of them are subpoenas *duces tecum,* except the one to the individual Pesante and require them to produce papers, documents, etc., described as follows:

"Books, records, correspondence and documents showing:

"1. Names and addresses of owners, partners, officers, directors and stockholders, with interest of each, of the McMahan store (giving location);

"2. Area and exclusive selling agreements, franchises, and licenses, under which the McMahan store (giving location) sells at wholesale or retail;

"3. The over-all purchases and sales in amount and value for the last calendar year of the McMahan store (giving location);

"4. The sales, in amount and value, made by the McMahan store (giving location) to points outside the State of California during the last calendar year;

"5. The names and addresses of the supply and wholesale firms and manufacturers from which the McMahan store (giving location) purchased or otherwise acquired goods, articles, materials or equipment, either for its own use or for sale or resale, during the last calendar year, and the value of the goods, articles, materials or equipment acquired from each firm or manufacturer;

"6. The original source of goods, articles, materials and equipment purchased or otherwise acquired by the McMahan store (giving location), either for its own use or for sale or resale, during the last calendar year;

"7. Exchanges, transfers and loans of personnel between the McMahan store (giving location) and any other McMahan store, during the last calendar year;

"8. Exchanges, transfers, loans or purchases of goods, articles, materials and equipment between the McMahan store (giving location) and any other McMahan store, during the last calendar year, and the value thereof;

"9. Agreements or contracts of any kind between the McMahan store (giving location) or the persons, partnership, or corporation owning it, and any other McMahan store or persons, partnerships or corporations owning any other McMahan store, concluded or in effect between January 1, 1952, and July 16, 1953;

"10. Loans or advances of money, capital or credit from the McMahan store (giving location) or the persons, partnership, or corporation owning it, to any other McMahan store or to persons, partnerships or corporations owning any other McMahan store, or vice versa, during the last calendar year, and the value thereof. (On subpena to Phoenix and 317 American Ave., Long Beach, only:)

"11. The business relationship between McMahan's of Long Beach and McMahan's Furniture Co. in

Phoenix, Arizona, and the family relationship between any owners, partners, officers, directors or stockholders of these two companies."

except one, which requires the following:

"1. Names and addresses of owners, partners, officers, directors and stockholders, of each McMahan store in the Santa Monica Division, of McMahan Furniture Stores, with interest of each;

"2. Area and exclusive selling agreements, franchises and licenses under which the Santa Monica Division of McMahan Furniture Stores, and each or any store in the Santa Monica Division of McMahan Furniture Stores, sells at wholesale or retail;

"3. The overall purchases and sales in amount and value for the last calendar year of the Santa Monica Division of McMahan Furniture Stores and of each store in the Santa Monica Division of McMahan Furniture Stores;

"4. The sales, in amount and value, made by the Santa Monica Division of McMahan Furniture Stores, and each and any store in the Santa Monica Division of McMahan Furniture Stores, to points outside the State of California during the last calendar year;

"5. The names and addresses of the supply and wholesale firms and manufacturers from which the Santa Monica Division of McMahan Furniture Stores, and each and any store in the Santa Monica Division of McMahan Furniture Stores, purchased or otherwise acquired goods, articles, materials or equipment, either for its own use or for sale or resale, during the last calendar year; and the value of the goods, etc., acquired from each firm or manufacturer;

"6. The original source of goods, articles, materials, and equipment, purchased or otherwise acquired by the Santa Monica Division of McMahan Furniture Stores, and by each and any store in the Santa Monica Division of McMahan Furniture Stores, either for its own use or for sale or resale, during the last calendar year."

■ The Court will take judicial notice of the fact that Phoenix is approximately 400 miles from Los Angeles and that the various other 25 cities in California in which the stores are located are situated varying distances from Los Angeles up to more than 200 miles.

The notice issued on September 23, 1953 (above adverted to), by the Regional Director of the National Labor Relations Board of a "representation" hearing under Section 9(c) of the Act fixed the date of the hearing on the 15th day of October, 1953 at ten o'clock a. m. Room 704, 111 West 7th St., Los Angeles, California: and the subpoena to Pesante required him to appear at that date and hour.

All of the other subpoenas are returnable at that address in Los Angeles, on the 9th of October, 1953, at two o'clock p. m., at which time no hearing was set or noticed. In short, it is conceded that the 29 subpoenas *duces tecum* required the production of documents and records not at the (or any) hearing required to be noticed under Section 9 (c) of the Act, but solely for the purpose of permitting the counsel for the Regional Director to examine those books and records at his office at his convenience rather than at the plants of the various concerns prior to the date of the hearing.

The subpoenas are claimed to be issued under the terms and provisions of Section 11 of the Taft-Hartley Act, 29 U.S.C.A. § 161. None of those named in the subpoenas, either "parties" or others, appeared at the hearing; and a special appearance with a petition to the Board to revoke the subpoenas was filed on behalf of all of them, based upon all of the grounds here urged in opposition to their enforcement. The petition to revoke was referred by the

Regional Director to a hearing officer of the Board who heard it and denied it except for item numbered 6. The Board thereupon filed the instant proceeding seeking enforcement of the subpoenas.

The respondents are opposing the order requiring obedience to the subpoenas on several grounds:

1. The subpoenas are void as not having been issued by the *Board* or a *member* thereof in compliance with Section 11 of the Act; and Section 102.58 (c) [1] of the Regulations authorizing the Regional Director or a hearing officer to issue subpoenas is void as being in excess of, and contrary to, the powers granted to the Board under the Act;

2. The Regulations of the Board [§ 102.58(c)] which permits a petition to revoke subpoenas to be heard and passed on by any other than the Board or a panel of three members thereof is void as being in excess of, and contrary to, the powers granted to the Board to make regulations under the Act, and contrary to the express provisions of Section 11.

3. The subpoenas *duces tecum* are invalid in that they were returnable at other than a duly noticed hearing;

4. No proper application for the same was made under the rules and regulations of the Board in that counsel for the Regional Director requested the Regional Director to issue the subpoenas and that counsel for the Regional Director is not a "party" authorized to request subpoenas either by the Act or the regulations.

5. No appropriate or proper description of the evidence is set forth or reasonable notice thereof, and the subpoenas are void as being burdensome.

As against these contentions by the respondents, the Board's counsel claims the regulations authorizing a Regional Director or hearing officer to issue subpoenas is a valid delegation of authority, as well as the regulations which permit a petition for revocation to be heard and passed on by any other than the Board or a panel of three members thereof; and that the subpoena power can be used at a time other than at a regular scheduled hearing in a "representation" proceeding, if the application was proper and if the subpoenas are not burdensome.

The pertinent provisions of the Act are Section 6, 29 U.S.C.A. § 156,[2] Section 9(c) (1), 29 U.S.C.A. § 159(c) (1),[2]

---

1. "Sec. 102.58. * * *

"(c) Applications for subpenas may be filed in writing by any party with the regional director if made prior to hearing, or with the hearing officer if made at the hearing. Applications for subpenas may be made *ex parte*. The regional director or the hearing officer, as the case may be, shall forthwith grant the subpenas requested. Any person subpenaed, if he does not intend to comply with the subpena, shall, within 5 days after the date of service of the subpena, petition in writing to revoke the subpena. Such petition shall be filed with the regional director who may either rule upon it or refer it for ruling to the hearing officer: *Provided, however,* That if the evidence called for is to be produced at a hearing and the hearing has been opened, the petition to revoke shall be filed with the hearing officer. Notice of the filing of petitions to revoke shall be promptly given by the regional director or hearing officer, as the case may be, to the party at whose request the subpena was issued. The regional director or the hearing offi-

cer, as the case may be, shall revoke the subpena if, in his opinion, the evidence whose production is required does not relate to any matter under investigation or in question in the proceedings or the subpena does not describe with sufficient particularity the evidence whose production is required. The regional director or the hearing officer, as the case may be, shall make a simple statement of procedural or other grounds for his ruling. The petition to revoke, any answer filed thereto, and any ruling thereon, shall not become part of the record except upon request of the party aggrieved by the ruling. Persons compelled to submit data or evidence are entitled to retain or, on payment of lawfully prescribed costs, to procure copies or transcripts of the data or evidence submitted by them."

2. "Sec. 6. The Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by the Administrative Procedure Act, such rules and regulations as may be necessary to carry out the provisions of this Act."
 "Sec. 9. * * *

and Section 11(1), 29 U.S.C.A. § 161.[3]

To aid the court, counsel for respondents supplied the two volume legislative history of the Taft-Hartley Act for reference to such portions thereof as might be pertinent.

Respondents' contentions set forth in grounds 1 and 2 above, to the general effect that the subpoenas are void, as not having been issued by the Board or a member thereof in compliance with the Act and that the Board had no power to delegate the authority to the Regional Director to issue subpoenas, and that the Board had no power to delegate the authority to hear a petition for revocation will be considered together.

Respondents rely particularly upon Cudahy Packing Co. of Louisiana v.

Holland, 1942, 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895, and on the legislative history of the Act. Counsel for applicants rely principally upon *Fleming v. Mohawk Wrecking & Lumber Co.,* 1947, 331 U.S. 111, 67 S.Ct. 1129, 91 L. Ed. 1375; N. L. R. B. v. John S. Barnes Corp., 7 Cir., 1949, 178 F.2d 156; J. B. Edwards v. N. L. R. B., 5 Cir., 1951, 189 F.2d 970; Jackson Packing Co. v. N. L. R. B., 5 Cir., 1953, 204 F.2d 842, and N. L. R. B. v. Anchor Rome Mills, Inc., 5 Cir., 1952, 197 F.2d 447, and upon the legislative history of the Act.

The Act as originally passed by the House of Representatives contained a provision in Section 11 which permitted the Board *or its duly authorized agent or agents* to revoke, *"if in its, his, or their"* opinion evidence did not relate

"(c) (1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—
"(A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in section 9(a), or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in section 9(a); or
"(B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in section 9(a);
the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof."

**3.** "Sec. 11. For the purpose of all hearings and investigations, which, in the opinion of the Board, are necessary and

proper for the exercise of the powers vested in it by section 9 and section 10—
"(1) The Board, or its duly authorized agents or agencies, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question. The Board, or any member thereof, shall upon application of any party to such proceedings, forthwith issue to such party subpenas requiring the attendance and testimony of witnesses or the production of any evidence in such proceeding or investigation requested in such application. Within five days after the service of a subpena on any person requiring the production of any evidence in his possession or under his control, such person may petition the Board to revoke, and the Board shall revoke, such subpena if in its opinion the evidence whose production is required does not relate to any matter under investigation, or any matter in question in such proceedings, or if in its opinion such subpena does not describe with sufficient particularity the evidence whose production is required. Any member of the Board, or any agent or agency designated by the Board for such purposes, may administer oaths and affirmations, examine witnesses, and receive evidence. Such attendance of witnesses and the production of such evidence may be required from any place in the United States or any Territory or possession thereof, at any designated place of hearing."

to any matter under investigation or "*if in its, his, or their opinion*" the subpoena did not describe with sufficient particularity the evidence whose production was required. The Act as originally passed by the Senate had no provision in it relating to the revocation of subpoenas. *But the Act as finally adopted by both houses dropped the language which permitted any duly authorized agent or agents of the Board to revoke subpoenas or to hear petitions to revoke,* as contained in the original House Bill, and gave that authority only to the Board.

The specific language contained in the original House Bill is as follows: "Within 5 days after the service of a subpoena, any person requiring the production of any evidence in his possession or under his control, such person may petition the Board or its *duly authorized agent or agents* to revoke, and the Board, or *such agent or agents* shall revoke such subpoena if in its, *his* or *their* opinion, as the case may be, the evidence whose production is required does not relate to any matter under investigation or any matter in question in such proceeding, or if in its, *his* or *their* opinion, as the case may be," the subpoena did not describe with sufficient particularity the documents desired.

Section 11 as finally passed by both Houses of Congress reads as follows (italics and paragraphing supplied):

"Sec. 11. For the purpose of *all hearings and investigations,* which, in the opinion of the Board, are necessary and proper for the exercise of the powers vested in it by section 9 and section 10—

"(1) The Board, *or its duly authorized agents or agencies,* shall at all reasonable times have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question. The *Board, or any member thereof,* shall upon application of any *party* to such proceedings, forthwith issue *to such party* subpenas requiring the attendance and testimony of witnesses or the production of any evidence in such proceeding or investigation requested in such application. Within five days after the service of a subpena on any person requiring the production of any evidence in his possession or under his control, such person may petition *the Board* to revoke, and *the Board* shall revoke, such subpena if in *its* opinion the evidence whose production is required does not relate to any matter under investigation, or any matter in question in such proceedings, or if in its opinion such subpena does not describe with sufficient particularity the evidence whose production is required. *Any member* of the Board, *or any agent or agency designated by the Board for such purposes,* may administer oaths and affirmations, examine witnesses, and receive evidence. Such attendance of witnesses and the production of such evidence may be required from any place in the United States or any Territory or possession thereof, at any designated place of hearing."

The first sentence of Section 11(1) relates to investigations. It specifically gives authority to the Board or its duly authorized agents or agencies to do the things therein set forth. The second sentence contains no such broad delegation but is more limited and simply provides that *the Board or any member thereof* shall issue subpoenas. The third sentence relates to revocation and is still more limited. It omits any reference not only to any member of the Board or any of its agents or agencies but specifically *empowers the Board* and the Board only to revoke. The fourth sentence relates to the administration of oaths and the conduct of hearings. It is not limited and gives that power to *any member of the Board, any agency,* or *agency designated by the Board* for such purposes. It must furthermore be

noted that Section 11 applies to *all hearings and investigations*. Obviously from reading the text of the Act, and without any recourse to the legislative history, the conclusion is inescapable that Congress intended a different power to be granted to the Board in connection with the issuance of subpoenas than it did in its grant to the Board of the investigatory powers and the administration of oaths; and, just as obviously, it intended to grant a different power to the Board in connection with revocation of subpoenas than either the issuance thereof or the investigatory and oath giving powers.

From the face of the Act and from the legislative history it would seem to me that the powers granted in Section 11 concerning the issuance of subpoenas was not delegable and might be exercised by the Board *or any member* thereof, but that the *revocation* of subpoenas could *only* be exercised by the Board acting as *a whole Board* or through one of its panels authorized to be set up in panels of three, as set forth in Section 3(b) of the Act, 29 U.S.C.A. § 153(b).

The respondents rely in this connection on the Cudahy Packing Co. case, supra, which involved a determination of the powers of the Administrator under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. That Act contained no specific subpoena power provisions but adopted the provisions of the Federal Trade Commission Act. In that case the Administrator relied upon the provision of the Fair Labor Standards Act which provides, "the principal office of the Administrator shall be in the District of Columbia, but he or his duly authorized representative may exercise any or all of his powers in any place", 29 U.S.C.A. § 204(c); and that the authority to delegate the subpoena power was to be inferred from the nature of his duties which, under a provision of the Fair Labor Standards Act, required that he might, through designated representatives, gather data and make investigations authorized by

the Act; and that because of the great and onerous range of duties, Congress must have intended that he should be permitted to delegate his authority to issue and sign subpoenas. Of this argument Chief Justice Stone said, Cudahy Packing Co. of Louisiana v. Holland, supra, 315 U.S. at page 363, 62 S. Ct. at page 655: "But this argument loses force when examined in the light of related provisions of the Act and of the actual course of Congressional legislation in this field." In footnote 3 to that opinion, 315 U.S. 362, 62 S.Ct. 651, the legislative history is set forth. It appears therefrom that the Fair Labor Standards Act, as originally passed in both the Senate and the House Bill, *gave* specific authority to *delegate* subpoena power but that that authority was *eliminated* when the Act was finally passed by Congress and "that the purpose of the conference, and of Congress in adopting the Act, was not to grant a general substantive power of delegation, including that over subpoenas, * * *." Other portions of the opinion in that case, Cudahy Packing Co. of Louisiana v. Holland, supra, are pertinent and controlling in my judgment in the present instance. I have reference to the following, 315 U.S. at page 363, 62 S.Ct. at page 655:

"Unlimited authority of an administrative officer to delegate the exercise of the subpoena power is not lightly to be inferred. It is a power capable of oppressive use, especially when it may be indiscriminately delegated and the subpoena is not returnable before a judicial officer. Under the present Act, the subpoena may, as in this case, be used to compel production at a distant place of practically all of the books and records of a manufacturing business, covering considerable periods of time. True, there can be no penalty incurred for contempt before there is a judicial order of enforcement. But the subpoena is in form an official command, and even though improvi-

dently issued it has some coercive tendency, either because of ignorance of their rights on the part of those whom it purports to command or their natural respect for what appears to be an official command, or because of their reluctance to test the subpoena's validity by litigation. All these are cogent reasons for inferring an intention of Congress not to give unrestricted authority to delegate the subpoena power which it has in terms granted only to the responsible head of the agency.

"The subpoena power differs materially in these respects from the power to gather data and make investigations which is expressly made delegable by § 11. Without the subpoena that power is in effect a power of inspection at the employer's place of business to be exercised only on his consent. It is much less burdensome than the requirement of his selection of great numbers of books and papers and their production at other places. Because of these differences it seems to us fairly inferable that the grant of authority to delegate the power of inspection and the omission of authority to delegate the subpoena power show a legislative intention to withhold the latter. Moreover, if a subpoena power in the regional directors were to be implied from their delegated authority to investigate, we should have to say that Congress had no occasion expressly to grant the subpoena power to the Administrator, who also has the power to investigate, and that the grant to him was superfluous and without meaning or purpose.

"The entire history of the legislation controlling the use of subpoenas by administrative officers indicates a Congressional purpose not to authorize by implication the delegation of the subpoena power. The Interstate Commerce Act, the National Labor Relations Act, and the Federal Trade Commission Act, whose subpoena provisions were adopted by the present Act and by the Packers and Stockyards Act, all fail to grant authority to delegate the issuance of subpoenas. It appears that none of the agencies administering these acts, has construed the authority of its head to include the power to delegate the signing and issuance of subpoenas. On the other hand, Congress, in numerous cases, has specifically authorized delegation of the subpoena power. In others it has granted the power to particularly designated subordinate officers or agents, thus negativing any implied power in the head to delegate generally to subordinates. The suggestion that the Administrator is given authority to delegate the subpoena power because the applicable Trade Commission Act authorizes individual members of the Commission as well as the Commission itself to sign subpoenas overlooks the fact that the Administrator alone occupies a position under this Act corresponding to that of the Commissioners under their Act. The structure of the Trade Commission Act lends no support to the view that the Administrator has an implied power to delegate the signing and issuance of subpoenas to persons undesignated by the statute, a power not granted to or exercised by the Commission or its members.

"All this is persuasive of a Congressional purpose that the subpoena power shall be delegable only when an authority to delegate is expressly granted. That purpose has been emphasized here not only by the authority expressly given to delegate the power to conduct investigations, and in the adoption by reference of the subpoena provisions of the Federal Trade Commission Act, which contain no authority to delegate, *but by the legisla-*

*tive history of the present Act, which shows that the authority to delegate the subpoena power was eliminated by the Conference Committee from the bills which each House had adopted.* (Italics supplied.) Such authority expressly granted in the bill which passed the Senate, was rejected by the Conference Committee. It also discarded the provisions of the House bill which committed the administration of the Act to the Secretary of Labor, who has a general power of delegation under Rev.Stat. § 161, 5 U.S.C. § 22, 5 U.S.C.A. § 22 and placed in his stead the Administrator, who was given only the subpoena powers of the Federal Trade Commission incorporated in the House bill.

"We cannot assume that Congress was of the opinion that the present agency, when appropriately organized for the purpose, would be any the less able to function without the power in the Administrator to delegate the signing and issuance of subpoenas than the Federal Trade Commission, the Interstate Commerce Commission, and other agencies which have not been given and do not assert the power. *Nor can we assume, as the Government argues, that Congress is wholly without design in withholding the power in this case and granting it in others, or even if it had been, that it is any part of the judicial function to restore to the Act what Congress has taken out of it. Even though Congress has underestimated the burden which it has placed upon the Administrator, which is by no means clear, we think that the legislative record establishes that Congress has withheld from him authority to delegate the exercise of the subpoena power, and that this precludes our restoring it by construction.*" (Italics supplied.)

Fleming v. Mohawk, supra [331 U.S. 111, 67 S.Ct. 1134], does not reverse or modify the Cudahy case. On the contrary, it clearly distinguishes it by pointing out that the Senate Committee reporting the Emergency Price Control Act under discussion in Fleming v. Mohawk said that the provisions relied on, Section 201(a) of the Emergency Price Control Act, authorized the Administrator to "perform his duties through such employees or agencies by delegating to them any of the powers given to him by the bill." The voluminous history of the Taft-Hartley Act is searched in vain for any such statement by the majorities of the Committee reporting the bill.

■ Counsel for the Board attempts to brush off the legislative history in respect to Section 11 by saying that "Congress simply did not pay any attention to it." This Court can take *judicial notice* that there probably has never been any Act of Congress in recent years which received as much attention and discussions, in Congress and out, as the Taft-Hartley Act.

The Mohawk case further distinguishes the Cudahy case in saying that the Act involved in the Cudahy case granted no broad rule-making power, whereas the Emergency Price Control Act did grant such rule-making power in the following language: "The Administrator may, from time to time, issue such regulations and orders as he may deem necessary or proper in order to carry out the purposes and provisions of this Act", 56 Stat. 29, which is almost the same language as that contained in the Taft-Hartley Act. As to that the Supreme Court further said in the Mohawk case, 331 U.S. at page 121, 67 S.Ct. at page 1134: "Such a rulemaking power may itself be an adequate source of authority to delegate a particular function, *unless by express provision of the Act or by implication it has been withheld.* See Plapao Laboratories Inc. v. Farley, 67 App.D.C. 304, 92 F.2d 228." (Italics supplied.)

The express provisions of Section 11 of the Taft-Hartley Act granting power to the *Board or any member* thereof to issue subpoenas, and to the *Board* only to hear and act on petitions for revocation, when considered in light of the legislative history, specifically eliminating the power of any agent or agency of the board to hear petitions to revoke, brings Section 11 within the exception noted above in the Mohawk case, and clearly within the holding in the Cudahy case, that where an express delegation contained in an act before its final passage, is dropped out in conference, and thus passed by Congress, there is a clear implication that Congress did not intend such delegation.

■ That the rule-making power granted by Section 6 of the Act was not intended to supersede the express limitations of Section 11 on subpoenas is further demonstrated by the requirement in Section 11, that its provisions applied to "all hearings and investigations, which, in the opinion of the Board, are necessary and proper for the exercise of the powers vested in it by Section 9 and Section 10".

■ In examining other sections of the Taft-Hartley Act it is noted throughout that certain powers are granted to the Board and certain duties committed to them, and that certain things are authorized specifically to be done either by the Board or its members or by their agents or representatives. I will not refer to the many instances that such occurs as it would prolong this opinion unduly. But Section 11 itself is a sufficient illustration. And in view of the legislative history of the Act and the clear and specific language which did delegate the power to revoke subpoenas, which was dropped by Congress, the conclusion must follow that the Cudahy case and the Mohawk case are authority for the proposition that there clearly appears by the terms of the Act and by implication from its legislative history that Congress did not intend that the Board should have power to delegate to any

other than one of its members the authority to issue a subpoena and that the Board had no power to delegate to other than a panel of three the authority to hear a petition to revoke subpoenas, either by rule or otherwise.

As heretofore noted, the provisions of Section 11 relating to the issuance of the subpoenas permit said subpoenas to be issued by the Board *or any member* thereof, whereas the petition to revoke the subpoena is committed solely to the Board. The question then arises whether or not the subpoenas in this case may be said to have issued by a member of the Board under the Act.

■ This question was before the court in N. L. R. B. v. John S. Barnes, in the Seventh Circuit, supra. It there held that rubber-stamped subpoenas with the printed seal of the Board sent to the Regional Director, filled out by him on *his* own request, were valid. While I do not agree with the reasoning of that case in that connection, I do agree with its conclusion that the subpoenas, in so far as the rubber stamped signature of the member of the Board is affixed thereto, are valid under the terms of the Act. It is common practice in courts for counsel to secure from the clerk, subpoenas in blank, with the seal of the court, issued in the name of the court, and for counsel themselves to fill in the title to the action and the name of the party to be subpoenaed; and when served it is nevertheless the process of the court. Here, the members see fit to permit their names to be affixed by a clerk with a rubber stamp on subpoenas and leave them with the District Director in blank.

Counsel for the Board finds approval of the practice in issuing rubber-stamped subpoenas in the statement appearing in the Mohawk case, supra, 331 U.S. at page 123, 67 S.Ct. at page 1135, as follows: "The pyramiding in Washington of all decisions on law enforcement would be apt to end in paralysis. To tempt the Administrator to solve the problem by supplying all his offices with subpoenas signed in blank would not

further the development of orderly and responsible administration." If anything, it seems to me that the foregoing statement is a condemnation of subpoena signing with rubber stamps in blank, rather than an approval thereof. It is not a practice to be encouraged, but if the board members see fit to discharge their responsibility that way, it is in my judgment a compliance with the terms of the Act, particularly in view of the fact that the power to revoke is committed to the Board only.

■ But the matter of the revocation of the subpoena is in my judgment quite a different thing. That is so in court proceedings when a subpoena *duces tecum* is issued. The parties make a petition to the court for its revocation or recall, and the court must hear and decide it. By the Taft-Hartley Act, it seems to me inescapable that Congress intended to grant broad investigatory powers to the Board as well as subpoena issuing powers, but in order to prevent injustices and harassing, disrupting, and roaming expeditions into records, burdensome travel and burdensome subpoenas, that the question of the power of the Board to hear petitions to revoke was placed in the board and the board only. While the Court held in the Barnes case, supra, that the Board could delegate the power to hear a petition to revoke, it is nevertheless apparent upon an examination of the case that that question was not before the court and anything said concerning it was dicta. Furthermore, the provision concerning the power of the Board to revoke appeared first in the Taft-Hartley Act and was not in the previous Wagner Act. The power to revoke was not the subject of any of the opinions of the Fifth Circuit in either the Edwards case, the Anchor Rome Mills case, or the Jackson cases, supra. I hesitate to disagree with those members of the Seventh Circuit and Fifth Circuit in so far as the views herein expressed are in disagreement, but I am constrained to express my views as they appear to me.

The Barnes case, Jackson-Edwards, Anchor Rome Mills cases, as well as the Mohawk case, are further to be distinguished because in each of those instances the subpoenas were directed to the *parties* to the proceeding, whereas in the instant case, as will appear from the statement of facts at the commencement of this memorandum, all of the subpoenas but three were issued to persons who were *not parties* and there is absolutely no showing of any kind by affidavit or otherwise before the Court, and none appears to have been before the hearing officer, that they, or any of them, have any relation whatsoever to the three companies who were designated as "parties." In the Jackson case, supra, it appears that there was a petition to revoke the subpoenas heard by a trial examiner, but it does not appear that this question of the power of the Board to delegate to the trial examiner the authority to hear such petition for revocation was raised or briefed by the parties. It certainly was not touched on by the court.

That the construction herein based upon Section 11 is entirely logical is further indicated by the legislative history of the Act. On June 12, 1947, Senator Taft placed in the Congressional Record an analysis of the Act which appears in 93 Congressional Record, page 7,000 et seq. At page 7,002 appears his statement of analysis concerning Section 11. It reads as follows: "Section 11. It has been stated that in modifying the procedure for obtaining a subpoena we have dispensed with the requirement of materiality and relevancy. Such statements ignore the remainder of Paragraph (1) which provides that the Board shall revoke its subpoena on a motion to quash if the evidence required is not relevant or not described with sufficient particularity."

■ The next ground of objection urged by the respondents is that the subpoenas were returnable at other than a duly noticed hearing. The Fifth Circuit, in N. L. R. B. v. Anchor Rome Mills, supra, sustained the issuance of

a subpoena at other than a duly scheduled hearing in an "unfair labor" practice case under Section 10, although that opinion appears to me to be directly contrary to the statement in the House Report on the Bill as to Section 11, as follows: "The Bill provides that the Administrator may obtain and serve subpoenas and examine witnesses in advance of hearings in representation cases under Section 9, but that he may not require employers, unions or employees to disclose their evidence in advance of hearings in unfair labor practice cases under Section 10." No reference is made in the opinion in the Anchor Rome Mills case to this statement in the House Report and it is unknown whether or not it was called to the court's attention. Nevertheless, it seems to me, that in view of the more loosely permitted proceedings in a "representation" case under Section 9 than in "unfair labor" practice cases under Section 10, and in view of the above-quoted statement in the House Report concerning the right to examine witnesses in advance of hearing in representation cases under Section 9, that this objection of the respondents is not well taken, and is therefore not sustained. However, this factor may be considered by the court in determining whether or not the subpoenas are oppressive and burdensome.

 The next ground urged by respondents is that the subpoenas are all invalid, including the one to Pesante, because they were not made upon request of a "party" to the proceedings. Title 29 C.F.R. § 102.8 defines the term "party." It is quoted in text in the margin.[4] By that regulation the Regional Director may be a "party to a

proceeding." The subpoenas in the instant case recite as follows: "Request therefor having been duly made by Ernest L. Heimann, Counsel for Regional Director, 21st Region, National Labor Relations Board, etc." Neither the Act nor the Regulations provides that counsel is a "party," nor has my attention been called to any regulation which delegates to the General Counsel's Office the power to request a subpoena. It does not seem to me that the Act contemplated that the General Counsel or any of the attorneys under his supervision as provided by Section 3(d) of the Taft-Hartley Act could become a "party," or a partisan in any respect. In the instant proceeding the Board instituted the matter upon the request of a local of the Teamsters' Union. It is now a matter of common knowledge that the Teamsters' Union has a general counsel regularly employed and, in fact, in the instant case Mr. Stevenson, counsel for the Teamsters' Union, was present during a portion or all of the arguments. It seems clear to me that Congress by the Act, and the Board by its Regulations, intended to, and did, leave it up to the *parties* to request subpoenas. The General Counsel's functions and duties are distinct and different than those of the Board; Evans v. International Typographical Union, D.C., 76 F.Supp. 881. Furthermore, clearly from the definition of "party", adopted by the Board as above indicated in Section 102.8, the counsel is not a "party." Under the terms of the Act only a "party" can request a subpoena. Respondents' contention in this respect, therefore, in my judgment, is valid.

 We come now to the last contention of the respondents, that the sub-

---

4. "§ 102.8 *Party*. The term 'party' as used in this part shall mean the regional director in whose region the proceeding is pending, and any person named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in any Board proceeding, including, without limitation, any person filing a charge or petition under the act, any person named as respondent, as em-

ployer, or as party to a contract in any proceeding under the act, and any labor organization alleged to be dominated, assisted, or supported in violation of section 8(a) (1) or 8(a) (2) of the act; but nothing in this part shall be construed to prevent the Board or its designated agent from limiting any party to participate in the proceedings to the extent of his interest only."

poenas are void because they are burdensome in that there is no proper description of the evidence nor reasonable notice thereof. As I heretofore indicated, I consider the fact that they were returnable at other than the hearing date as one of the elements that may be taken into consideration in connection with discussing this point. I have examined the subpoenas and the list of documents and data required. It does not seem to me that they properly describe the evidence required to be produced or give reasonable notice.

The Anchor Rome Mills case, supra, and the Jackson case, supra, so heavily relied upon by the Board in other particulars, are authority for the proposition that if subpoenas are too broadly or oppressively drawn, it would be the duty of the court to prevent abuse of its process by denying enforcement of such subpoenas.

As appears from the statement at the commencement of this memorandum, subpoenas would require 30 different stores located in 26 different communities, engaged in a retail furniture and appliance business, to bring their books and records 200 to 400 miles from their place of business to Los Angeles, at a time when there was no hearing scheduled and no parties present, merely to suit the convenience of the counsel for the Board and permit him to examine those books and records at his leisure when none of the organizations who are the subject of subpoena is a "party" to the proceeding, except the three first hereinbefore mentioned.

On argument, Mr. Heimann, counsel for the Board, stated: "These exhibits were made returnable prior to the hearing in order to give me an opportunity to look them over so as to be prepared to present them in proper form at the hearing." In an effort to justify the issuance of the subpoenas Mr. Heimann filed two affidavits in the proceedings here, the general effect of them being that on August 4 and again on August 10 and on July 2, 1953, certain information had been demanded by counsel for the Board from Mr. Pesante and that the information had been refused; that in view of the refusal to give the information it was necessary to issue these subpoenas. It must be kept in mind that there were only 3 stores against which proceedings were pending, or had been initiated, viz.: the *one* store in Long Beach for unfair labor practices under Section 10, and the two stores in Long Beach and the one in Wilmington for a representation proceeding under Section 9. It is conceded by counsel for the parties hereto that in an unfair labor proceeding under Section 10 the respondent employers are not required to disclose any evidence in advance of hearing while such unfair labor practice charge is pending. It is noted the unfair labor practice charge was not dismissed until August 24, 1953, long after the demands were made. That being so, Pesante and his counsel were justified in not disclosing their records at the time of the demands. Moreover, there is no showing whatsoever that Pesante had anything to do with any of the stores other than those in Long Beach and Wilmington, and the showing in that respect is meager. In view of that fact, and the fact that no proceedings of any nature were pending against any of the other stores except those in Long Beach and Wilmington, there is no shred of justification to be found in the affidavits filed in support of requiring all these other 26 stores to bring what has been described as truckloads of books and records from distances ranging from 200 to 400 miles from Los Angeles to the City of Los Angeles, merely to suit the convenience of the counsel for the Board. Particularly is this so in view of the investigative facilities of the Board in a Section 9 proceeding, aside from the use of the subpoena power.

It is difficult to conceive of any more oppressive abuse of the subpoena power. How long the records would be required to be kept there is not known except by statement of counsel they would have been there (that is the records)

at least until the 15th, as counsel indicated he wanted the opportunity to examine them so he would properly present them at the hearing on the 15th. The companies would thus be deprived of their current records and would be put to vast expense and trouble. For that reason the subpoenas are oppressive as to all of the companies and organizations named. The order will be that they will be quashed on that ground and for the reasons hereinbefore expressed.

Counsel will prepare appropriate judgment in accordance with the foregoing memorandum.