Earl **VAN BLARICOM,** Petitioner-Appellant,

v.

Donald **FORSCHT,** as United States Marshal, et al., Respondents-Appellees.

No. 72-1374.

United States Court of Appeals, Fifth Circuit.

Feb. 21, 1973.

J. V. Eskenazi, Federal Public Defender, Theodore J. Sakowitz, Asst. Federal Public Defender, Miami, Fla., for petitioner-appellant.

Robert W. Rust, U. S. Atty., Carol M. Anderson, Asst. U. S. Atty., Miami, Fla., for respondent-appellee.

Before RIVES, WISDOM and RONEY, Circuit Judges.

RIVES, Circuit Judge:

Appellant's habeas corpus petition tests the validity of the revocation of his parole as a federal prisoner. November 1, 1971, was the date on which the parole was revoked. That was prior to June 29, 1972, the date of the Supreme Court's decision in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484, but subsequent to Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, decided March 23, 1970. The narrow question to be decided is whether the procedure employed in revoking appellant's parole conformed to the then applicable federal statutory, administrative, and constitutional requirements. We answer that question in the negative and reverse.

## THE PERTINENT FACTS

Earl Van Blaricom (hereinafter, Blaricom) was convicted on a charge of interstate transportation of a stolen motor vehicle and was sentenced to serve a term of five years. Service of his sentence began on July 11, 1968. On June 10, 1971, he was mandatorily released[1] from the federal prison camp, McNeil Island, Washington, with some 542 days remaining to be served under supervision.

On July 13, 1971, a warrant for his retaking was issued.[2] The warrant application contained four charges against Blaricom and a summary of the evidence on each charge. The charges were: (1) failure to work regularly; (2) acting as an informant for a law enforcement agency; (3) association with persons having criminal records; and (4) failure to report change in residence.

On August 28, 1971, Blaricom was taken into the custody of the United States Marshal, Miami, Florida. A revocation hearing was held in Miami on October 20, 1971, by Mr. William F. Howland, Jr., a member of the United States Board of Parole. Blaricom was present and was represented at the hearing by the Federal Public Defender. The Public Defender requested permission to have the proceedings transcribed by a court reporter, but Mr. Howland

---

1. In accordance with § 4163, Tit. 18, U.S. Code.

2. In accordance with 18 U.S.C. § 4205.

declined that request and ruled that the only recording would be done by the device furnished by the Board. Mr. Howland ruled further that there would be no confrontation or cross-examination of witnesses, but that Blaricom could bring in any witnesses who would voluntarily testify in his behalf. Mr. Howland proceeded: "So the way we do this, I'll read you these charges and you can tell me anything you wish to admit, deny or explain." Blaricom undertook to deny or explain, or offer matters in extenuation of each of the four charges.

As to the fourth charge, he admitted that he failed to report his change in address [3] when he left Las Vegas "to continue to my home in Mexico. * * * * I returned to my home in Mexico and rejoined my wife and kids." He admitted that he had refused to sign or accept a "Certificate of Mandatory Release" (Parole Form 1–11) which provided that "He is to remain within the limits of District of Nevada," and insisted that the only form furnished to him upon his release from prison was a "Notice of Release and Arrival" (Parole Form 1–13). That form, which he produced, had typed on its face and underscored "Transportation was arranged to Xilitla, S.L.P., Mexico (via) Bus"; and after the printed words "Special Instructions:" there was typed and underscored: "Will report initially to Las Vegas, Nevada, U.S.P.O. and then continue to home in Mexico."

Mr. Howland stated to Blaricom: " * * * the institution does not have the authority to grant you permission to go south of the continental limits of the U. S. Only the Parole Board has that authority * * *." The Public Defender introduced the Parole Form 1–13 and asked Blaricom, " * * * who gave you this instrument?" Blaricom replied: "The cashier at the institution the morning I left with the tickets." Blaricom admitted that the Probation Officer at Las Vegas told him that he could not go on to Mexico and that thereafter he did go.

Mr. Howland stated to the Public Defender:

" * * * Counsellor, I have found in this file Certificate of Mandatory Release and I think it's dated June 10, 1971. There's a notation on here— Refusing to Sign Unless Certificate includes condition that he is to return to Mexico. And if you did not sign them it would seem that they did not put that condition in there."

Thereafter the lady who was secretary to the Public Defender testified:

"Mr. H. [Howland]: When you called McNeil Island this morning, with whom did you talk?

"Lady: Well, I should have asked the man's name, but I didn't. I called a few minutes before 11 and had to wait to get the operator and she said they are on the way up there. I waited about 2 minutes and then when I got the man . . .

"Mr. H.: Did you explain . . . what explanation did you give them so they could . . .

"Lady: I said I was from the Public Defender's Office and we were trying to verify some information and I gave the defendant's name and said that we would like to know if they were always giving out bus tickets when they left the institution. In about 6 or 7 minutes he got the records and came back and he said to Mexico and with a stop at Las Vegas.

"Mr. H.: And you don't know who that was?

"Lady: I would be glad to call back and find out if you'd like.

"Mr. H.: How did you place the call?

"Lady: FTS."

The hearing before Mr. Howland was the only hearing accorded to Blaricom on the revocation of his parole. Some

---

3. The Public Defender argued that this was not a "change in residence" and that the respondents knew Blaricom's place of residence in Mexico.

twelve days thereafter, on November 1, 1971, his parole was revoked. The actual order of revocation does not appear in the record before this Court. The formal written response to Blaricom's amended petition for habeas corpus stated:

"The procedure which the board followed in this instance, as it does in every such case, is that one member of the board of parole is selected to conduct the revocation hearing, and at the conclusion of the hearing he then takes the record of the hearing before the entire board and the decision to revoke is the act and deed of the entire board of parole." [R. 16.]

The Public Defender took issue with the statement that the Board followed that procedure in this case. On the hearing before the district court, counsel for respondents produced the order of revocation and then conceded that the parole was revoked by a vote of two out of three members of the Board, continuing:

"In the order, if you will notice, the names on the order are blanked out, and the reason for this is because the person—we do not give out the name of the person who signed the order or the people who vote, because it is a vote of two out of three. And this we will be glad to give to Your Honor in chambers, but it is not given to the defendant or to defense counsel." [Tr. 41, 42.]

On oral argument before this Court counsel for the respondents-appellees conceded that, "The full Board has not considered this case." Neither Mr. Howland nor any other member of the Board has stated the ground or grounds upon which Blaricom's parole was revoked nor the reasons for the severity of the punishment. The best evidence this Court has of the precise terms of the order of revocation is the unchallenged statement of the Public Defender upon oral argument to the effect that it was a one-sentence order, "Parole revoked continued for term, 542 days."

## I.

### Statutory Requirements

The statutory procedural requirements for revocation of parole of a federal prisoner are succinctly stated in three one-sentence paragraphs in 18 U.S.C. § 4207:

"A prisoner retaken upon a warrant issued by the Board of Parole, shall be given an opportunity to appear before the Board, a member thereof, or an examiner designated by the Board.

"The Board may then, or at any time in its discretion, revoke the order of parole and terminate such parole or modify the terms and conditions thereof.

"If such order of parole shall be revoked and the parole so terminated, the said prisoner may be required to serve all or any part of the remainder of the term for which he was sentenced."

In Earnest v. Moseley, 10 Cir. 1970, 426 F.2d 466, the revocation hearing was held by William F. Howland, Jr., a member of the Board of Parole, and later on the same day the prisoner's mandatory release was revoked in an order signed by Mr. Howland and by Walter Dunbar, another member of the Board. The Tenth Circuit affirmed the denial of the prisoner's petition for habeas corpus, opining in part:

"Title 18 U.S.C. § 4207 provides for a revocation hearing before the Board, a member of the Board, 'or an examiner designated by the Board.' It then provides:

'The Board may then, or at any time in its discretion, revoke the order of parole and terminate such parole or modify the terms and conditions thereof.'

We see nothing in this language which would compel the conclusion that the entire Board must decide on every parole revocation. The creation of the Board and Congress' vesting in it a very broad discretion carries with it an inherent authority to establish

such procedures as will best effectuate Congress' purpose in establishing the Board and the parole system. The Court in Hyser v. Reed, 115 U.S.App. D.C. 254, 318 F.2d 225, 242 n. 14, noted that for the fiscal year 1960 the Parole Board held 12,640 hearings of all types and issued 1,016 warrants for the arrest of parole violators and 670 warrants for the arrest of mandatory release violators. To too narrowly circumscribe the authority of the Board to establish its own internal procedures and effectively distribute its work load would impose an undue burden on the Board and, indeed, the entire parole system. As this court said in Christianson v. Zerbst, 89 F.2d 40 (10th Cir.), the proceedings of the Board in revoking the parole or conditional release are presumptively correct. Unless it is clearly shown that the procedures established by the Board are clearly discriminatory or so lacking in fundamental fairness as to deprive the parolee or releasee of due process, or that those procedures are clearly contrary to the statutes creating and regulating the Board, the court will not attempt to substitute its judgment for that of the Board."

426 F.2d at 469.

The date of that decision was April 14, 1970, rehearing denied May 19, 1970. Several months later, on October 1, 1970, the Board issued its Directive No. 6, now appearing as 28 C.F.R. § 2.40:

"§ 2.40   *Revocation by the Board.*

"A prisoner who is retaken pursuant to a warrant issued by the Board or a member thereof shall, while being held in custody under authority of such warrant awaiting possible return to a Federal institution, be afforded a preliminary interview by an official designated by the Board. Following receipt of a summary or digest of the preliminary interview, the Board shall afford the prisoner an opportunity to appear before the Board, a member thereof, or an examiner designated by the Board.

If the prisoner requests a local hearing prior to return to a Federal institution in order to facilitate the retention of counsel or the production of witnesses, and if he has not been convicted of a crime committed while under community supervision, and if he denies that he has violated any condition of his release, he shall be afforded a local revocation hearing reasonably near the place of the alleged violation (or one of the alleged violations if more than one is alleged). Otherwise, he shall be given a revocation hearing after he is returned to a Federal institution. Following the revocation hearing, the Board may then or at any time within its discretion revoke and terminate the order of parole or mandatory release or modify the terms and conditions thereof. Whenever a parole or mandatory release is thus revoked, the prisoner may be required to serve all or any part of the remainder of the term for which he was sentenced, less such good time as he may earn following his recommitment."

■ The directive recognizes that Congress has vested in *the Board* the power *in its discretion* to revoke and terminate the order of parole or modify the terms and conditions thereof, and the further discretionary power, whenever a parole is thus revoked, to require the prisoner to serve all or any part of the remainder of the term for which he was sentenced. The Congress has not expressly provided for the Board's delegation of those discretionary powers to any one or more of its members. Nor do we find where Congress has granted the Board any power to make rules or regulations. We would, however, agree with the Tenth Circuit's holding in Earnest v. Moseley, *supra,* that the Board does have inherent authority to establish its own internal procedures. Pursuant to such power the Board has issued "directives" which appear in the Code of Federal Regulations.

Appellees-respondents argue in brief (p. 8) that "28 CFR 2.22 states that two

members of the Board shall constitute a quorum * * *." That section, however, applies to a hearing of attorneys, relatives and other interested persons with respect to *granting* a parole and has no application to a *revocation* and termination of the order of parole. 28 C.F.R. § 2.40, which we have quoted, is the Board's directive applicable to revocation.

We recognize the force of the pragmatic approach and reasoning of the Tenth Circuit in Earnest v. Moseley, quoted *supra*, though we have difficulty in squaring the holding in that case with the more doctrinaire logic of Cudahy Packing Co. v. Holland, 1942, 315 U. S. 357, 363, 364, 62 S.Ct. 651, 86 L.Ed. 895; Fleming v. Mohawk Co., 1947, 331 U.S. 111, 121, 67 S.Ct. 1129, 91 L.Ed. 1375 (which distinguished *Cudahy* because the Act there involved, like the Act presently involved, contained no broad rulemaking power); Labor Board v. Duval Jewelry Co., 1958, 357 U.S. 1, 7, 78 S. Ct. 1024, 2 L.Ed.2d 1097, and Lewis v. Labor Board, 1958, 357 U.S. 10, 15, 78 S. Ct. 1029, 2 L.Ed.2d 1103 (in each of which last cited cases *Cudahy* was distinguished on the ground that it did not involve the discretion of making the ultimate decision reserved to the Board).

■ However, the Board's directive No. 6, now appearing as 28 C.F.R. 2.40, heretofore quoted, and the Board's procedural practice pleaded in this case, heretofore quoted,[4] relieve us of the necessity of deciding whether or not this Circuit should render a decision contrary to the holding of the Tenth Circuit in Earnest v. Moseley, *supra*. That directive and procedural practice seem

intended to enable the Board to effectively distribute its work load without delegating its discretionary power to make the final decision on revocation of a prisoner's parole. As best we can determine, the procedure employed in revoking Blaricom's parole did not conform with the then applicable administrative procedure of the Board itself. Its failure so to conform was prejudicial to Blaricom and invalidated the revocation of his parole.[5] For the reasons stated we hold that the district court erred in denying Blaricom's petition for habeas corpus.

## II.

### *Constitutional Requirements*

A brief discussion of the minimum requirements of due process seems appropriate for the guidance of the district court and possibly of the Board in such further proceedings as may ensue upon remand.

■ The minimum standards of constitutional due process imposed on the federal Board of Parole are certainly no less than those imposed on the State Boards of Parole. See Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884. Presently the minimum requirements of due process imposed on State Boards include:

"(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not al-

---

4. To the effect that " * * * one member of the board of parole is selected to conduct the revocation hearing, and at the conclusion of the hearing he then takes the record of the hearing before the entire board and the decision to revoke is the act and deed of the entire board of parole."

5. Professor Davis has discussed the problem of "Subdelegation of Power" at some length in 1 Administrative Law Treatise

§§ 9.01—9.07, and in the last section has concluded:

"Because decisions are made and rules are issued in the names of agency heads, the problem of subdelegation of power to adjudicate and to issue rules seldom arises; the problem here is one of institutional decisions instead of subdelegation. The scattered federal case law has usually approved this kind of subdelegation."

lowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole."

Morrissey v. Brewer, *supra*, 408 U.S. 489, 92 S.Ct. 2593, 33 L.Ed.2d 484.

The district court in its opinion stated that the procedures adopted by the United States Board of Parole complied with the case of Hyser v. Reed, 1963, 115 U. S.App.D.C. 254, 318 F.2d 225. However, those procedures did not comply with Goldberg v. Kelly, *supra*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, decided before the initiation of the proceedings leading to the revocation of Blaricom's parole. The opinion in Goldberg v. Kelly, while relating to the termination of welfare benefits, clearly presaged at least two of the minimum standards of due process for revocation of parole as outlined in Morrissey v. Brewer, *supra*, *viz.*:

"(d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation);"[6]

and

"(f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole."[7]

Clearly those two minimum standards of due process were applicable at the time of the revocation of Blaricom's parole. Just as clearly there was no compliance with either of those two standards. We need not determine to what extent, if any, the decision in Morrissey v. Brewer, *supra*, should be retroactively applied because the procedure employed in revoking Blaricom's parole

did not conform to the constitutional requirements made applicable by Goldberg v. Kelly, *supra*.

It is within the discretion of the district court either forthwith to grant Blaricom's petition for habeas corpus or to allow the respondents a reasonable time to be fixed by the court within which to afford Blaricom another revocation hearing in Miami which must conform to presently applicable federal statutory, administrative, and constitutional requirements.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

6. "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." Goldberg v. Kelly, 397 U.S. 269, 90 S.Ct. 1021.

7. "[T]he decision maker should state the reasons for his determination and indicate the evidence he relied on * * *." Goldberg v. Kelly, 397 U.S. 271, 90 S.Ct. 1022.